TWENTIETH CENTURY FOX FILM CORPORATION, Plaintiff,

v.

MARVEL ENTERPRISES, INC., Tribune Entertainment Co., Fireworks Communications, Inc., and Fireworks Television (US) Inc., Defendants.

Marvel Entertainment Group, Inc., Plaintiff,

v.

Twentieth Century Fox Film Corporation, Defendant.

Nos. 01 CIV. 3016(AGS), 01 CIV. 3017(AGS).

United States District Court, S.D. New York.

Aug. 9, 2001.

2

Dale M. Cendali, O'Melveny & Myers LLP, New York City, for Plaintiff.

Jonathan D. Reichman, Dana Kaplan, Kenyon & Kenyon, New York City, for Defendant Marvel Enterprises, Inc.

Steven Rosenfeld, Ohrenstein & Brown, LLP, New York City, for Defendant Fireworks Communications, Inc. and Fireworks Television (US) Inc.

Gerald Singleton, Maura Wogan, Frankfurt Garbus Kurnit Klein & Selz, P.C., New York City, for Defendant Tribune Entertainment Co.

## *OPINION AND ORDER*

SCHWARTZ, District Judge.

In this action, plaintiff alleges breach of contract, trademark infringement, copyright infringement and related claims arising out of a proposed television series that is currently being developed and produced by defendants. Before the Court is plaintiff's motion for preliminary injunction, and defendants' cross-motion to dismiss the Amended Complaint. For the reasons set forth below, both motions are granted in part and denied in part.

## I. Factual Background [1]

## A. Parties

Plaintiff Twentieth Century Fox Film Corporation ("Fox"), a Delaware corpora-

tion with its principal place of business in Los Angeles, California, creates, produces, distributes and markets motion pictures and television shows throughout the world. (Fox Amend. Compl. ¶ 10.) Defendant Marvel Enterprises, Inc. ("Marvel"), a Delaware corporation with its principal place of business in New York, is purportedly the largest publisher of comic books in the United States, and creates, distributes, and markets comic books and related goods and merchandise throughout the world. (*Id.* ¶ 11; Defendants' Joint Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction ("Def.Mem.") at 5.) On occasion, Marvel also licenses to third parties the right to create, produce, distribute, and market motion pictures and television shows based on Marvel's comic book characters, concepts, themes, and storylines, and collaborates on such projects. (Fox Amend. Compl. ¶ 11.) As more fully explained below, Marvel licensed to Fox certain rights in its X–Men comic book series so that Fox could create, in association with Marvel, theatrical motion pictures based on such property. Marvel also has licensed certain rights to defendant Tribune Entertainment Co. ("Tribune") so that it may create, in cooperation with Marvel and defendants Fireworks Communications, Inc. and Fireworks Television (US), Inc. (collectively "Fireworks"), a live-action television series called Mutant X. Tribune, a Delaware corporation with its principal place of business in Los Angeles, California, creates, produces, distributes, and markets television shows throughout the United States; the Fireworks companies, which are subsidiaries of Can West Global Communications Corp., a Canadian media concern,

[1]. The following facts are drawn from the Amended Complaint and the submissions of the parties on the instant motions, and are substantially undisputed unless otherwise noted.

**6**

both have their principal places of business in California, and create, produce, distribute, and market television shows in the United States and Canada. (*Id.* ¶¶ 12–13.) Defendants Marvel, Tribune, and Fireworks are hereinafter collectively referred to as "defendants."

**B. X–Men Property**

In 1963, Marvel began publishing a comic book series called X–Men. In a book entitled *Ultimate X–Men,* co-published by Marvel in 2000, the premise of the X–Men story is described as follows:

> [The X–Men] were mutants: people born genetically different from the rest of humankind. Some people saw the rise of these superhuman mutants as the next step in human evolution. Many, however, regarded mutants as dangerous freaks, threatening the existence of the 'normal' human race. The growing numbers of mutants needed a champion, and they found one in a visionary named Charles Xavier. A mutant himself, Xavier had a dream of a future in which 'normal' humans and mutants would live together in peace and harmony. It was to make this dream a reality that Xavier created his organization of young mutants, the X–Men.

Peter Sanderson, *Ultimate X–Men* 9 (2000). The original six characters of the X–Men series were Professor Charles Xavier (aka Professor X), Scott Summers (aka Cyclops), Jean Grey/Marvel Girl (aka Phoenix), the Beast, Bobby Drake (aka Iceman), and Angel (aka Archangel). Also appearing in the original series were villains comprising the Brotherhood of Evil Mutants, in particular Magneto, the nemesis of Professor X, who believed that mutants should adopt violent and revolutionary means in order to claim their rightful place in society. (Fox Amend. Compl. ¶ 17; Declaration of Avi Arad dated June 18, 2001 ("Arad Decl.") ¶¶ 6, 8(a).) As conceived by Marvel, the X–Men are "metaphors for minorities and other disenfranchised groups . . . spanning from the Civil War to Auschwitz to the gay community." Furthermore, "the philosophical divide between Professor X and Magneto can be likened to that between Martin Luther King, Jr. and Malcolm X, in terms of the way each believes they should pursue their objectives for the mutant population." (Arad Decl. ¶ 7; *see also* Transcript of Oral Argument dated July 3, 2001 ("Tr.") at 59:24–25.)

Marvel has "create[d] many new titles spawned from the original X–Men series," which introduced new characters to the existing universe. (Arad Decl. ¶ 8.) Such additional titles include (i) Giant Size X–Men, released in 1975, (ii) The Uncanny X–Men, released in 1980, which supplanted the X–Men title and still continues, (iii) New Mutants, released in 1983, (iv) Alpha Fight, released in 1983, (v) X–Factor, released in 1986, (vi) Wolverine, released in 1988, (vii) Excalibur, released in 1988, (viii) X–Terminator, released in 1988, (ix) X–Force, released in 1991, (x) X–Men Unlimited, a series of short stories released in 1993, (xi) Generation X, released in 1994, (xii) X–Man, released in 1995, and (xiii) Mutant X, which was released in 1998 and ran through 2001. (*Id.;* Declaration of Joseph Witek, Ph.D. dated June 25, 2001 ("Witek Decl.") ¶¶ 23–25.) According to Marvel, it routinely registers copyrights in its comic books with the United States Copyright Office, and its character names and comic books with the United States Patent and Trademark Office. (Marvel Compl. ¶ 13.) It currently possesses at least ten federal trademark registrations for or incorporating its X–Men mark in connection with various goods and services, including its comic books, magazines, and illustrated stories. (*Id.* ¶ 16, Ex. A.)

## C. 1993 Agreement

In October 1993, Fox and Marvel entered into an agreement (the "1993 Agreement" or "Agreement") pursuant to which Marvel licensed to Fox the exclusive right to create, produce, distribute and market theatrical motion pictures based on the "X–Men Property" (or "Property"), which refers to the "X–Men comic book series." (1993 Agreement ¶ 6.) The scope of the grant of rights was broad, although the media within which they could be exploited (i.e. theatrical motion pictures) was narrow. Paragraph 6 of the Agreement, entitled "Granted Rights," states that Property to which Fox obtained rights included (i) certain characters specified in Exhibit A to the Agreement, (ii) the so-called "origin stories" of those characters appearing in the story or screenplay of the film, (iii) all individual storylines from individual comic books other than the origin stories, and, in a catch-all provision, (iv) "all other elements relating to the Property and the Characters." (*Id.*) (emphasis added). This paragraph also specifies that the rights "include the right to use the title (or subtitle or portion of the title) of the Property or any component of the Property as the title of any Picture or related exploitation." (*Id.*) In addition to the $1.6 million purchase price, (Declaration of Thomas Rothman dated June 26, 2001 ("Rothman Decl.") ¶ 10) [2], and a percentage of gross proceeds, (1993 Agreement ¶¶ 4, 5), Marvel was able to reserve, in Paragraph 7 of the Agreement, certain rights for itself in connection with the films to be developed by Fox.[3] Other ancillary rights, which define the scope of Fox's granted rights as applied to other media, are treated in Paragraph 8, the content of which is at the center of the parties' contractual dispute in this case. Paragraph 8, entitled "Other Rights," reads in pertinent part:

> Marvel reserves all television rights [based on the Property] (other than television rights with respect to the Pictures produced hereunder). However, prior to the reversion (if any) of the Rights ... Marvel shall not, without Fox's prior written consent, which consent may be withheld in Fox's sole discretion, produce, distribute or exploit or authorize the production, distribution or exploitation of any live-action motion picture for free television exhibition, pay television exhibition, non-theatrical exhibition, or home video exhibition (on cassettes or discs) or any feature-length animated motion picture for non-theatrical exhibition or home video exhibition (on cassettes or discs).[4]

(1993 Agreement ¶ 8.) The possible reversion of rights to Marvel is addressed in Paragraph 9. In effect, this paragraph sets control dates by which Fox must create sequels by requiring reversion where "Subsequent Pictures" are not made with-

---

**2.** Fox's Senior Vice President for Participations, Steven Kaplan, breaks down this figure as: (i) $150,000 for the initial option to purchase the rights in the X–Men comics; (ii) $100,000 for subsequent extensions of the option period; and (iii) $1,350,000 to exercise the option. (Declaration of Steven Kaplan dated June 24, 2001 ("Kaplan Decl.") ¶ 3.)

**3.** Paragraph 7 provides for (i) the sharing of merchandising rights and revenue, and the allocation of (ii) commercial tie-in rights, which are largely reserved to Fox, (iii) publication rights, which are largely reserved to Marvel, (iv) radio and live stage rights, which are largely reserved to Marvel, and (v) animated television series rights, which were held by a Fox Affiliate (Fox Children's Network) but would revert to Marvel upon the expiry of that license. (1993 Agreement ¶ 7.)

**4.** Paragraph 8 also provides that Fox's rights include all animated theatrical rights. However, Fox may not exploit such rights without Marvel's prior written consent. (1993 Agreement ¶ 8.)

in a certain time. (*Id.* ¶ 9.) The reversion dates set forth in this Paragraph were extended by an amendment to the Agreement signed by the parties on or about October 10, 2000.[5] (*See* "X–Men II" Amendment/Extension ¶ 2(d).)

Paragraph 11 further defines the logistics of the production of Fox's films, by requiring that Marvel must approve: (i) the "fundamental elements" of the story, namely the basic storyline, character integrity, living habitat, and conformity with the so-called "X–Men Handbook" written by Marvel; (ii) the screenplay, to the extent it substantially alters a fundamental element; (iii) costumes; (iv) the photography of scenes, to the extent it substantially alters a fundamental element; and (v) the content of director's cuts, to the extent it substantially alters a fundamental element.

Particularly given the catch-all provision in Paragraph 6, the scope of the license to Fox is broad, encompassing any property contained in the "X–Men Universe" of comic books that Fox "may require" in order to create and produce its films, including the right to use Marvel's copyrights and trademarks in such property as Marvel would as owner of such rights. However, Exhibit A to the Agreement limits the characters which Fox may exploit to (i) certain "Initial Characters," comprising the principal and featured characters in the approved story, screenplay, or Marvel's publications, as well as 15 other "Core Characters" from the X–Men Universe of comics, and (ii) certain "Additional Characters," who are among the characters from a limited "X–Universe" of seven comic books, which Fox may add by written notice to Marvel.[6] (Ex. A to 1993 Agreement ¶¶ 1, 3, 4.)

Finally, Paragraph 18 of the Agreement incorporates certain "Other Terms and Conditions" into the Agreement "[i]n accordance with Fox's standard Option/Purchase Agreement, but as such agreement would have been modified following good faith negotiation within Fox's usual parameters taking into account Marvel's and the Property's stature." (1993 Agreement ¶ 18.) While such provisions are generally designed to eliminate the future need for negotiation, this vague provision leaves additional terms and conditions largely open for negotiation based only on unspecified elements of custom.[7]

### D. X–Men Film

Following the 1993 Agreement, Fox spent nearly seven years developing "a story that offered the excitement of mutant superheroes, yet also addressed serious issues of intolerance and bigotry toward them in an entertaining way." (Plaintiff's Reply Memorandum of Law in Support of its Motion for Preliminary Injunction ("Pl.Rep.") at 2; Rothman Decl. ¶ 10.) In 1999, Fox began shooting an X–Men film, and, in June and July 2000, launched an extensive media promotional

---

**5.** Fox paid Marvel an additional $1,000,000 in connection with this amendment. (Kaplan Decl. ¶ 3.)

**6.** Pursuant to Exhibit A, Fox also has a right of first negotiation to obtain exclusive rights in those characters from the X–Universe that Fox has not yet used. (Ex. A to 1993 Agreement ¶ 6.) Also, where Fox does not exercise such right, and Marvel licenses X–Universe characters to a third party, the Agreement provides that the third party may not use the terms "X–Men," "X–Factor," or any similar reference to the "X–Universe" "in the title or marketing of the motion picture produced utilizing the Characters granted to such third party." (*Id.* ¶ 6(d).)

**7.** The remainder of the Agreement provides for cooperation between Fox and Marvel on the selection of principal staff members, including directors and producers, (1993 Agreement ¶¶ 12, 13), the allocation of film credits, (*Id.* ¶ 15), and confidentiality, (*Id.* ¶ 17).

effort as part of a $90 million campaign to "market and distribute 'X–Men' theatrically using distinctive imagery and messages." (Fox Amend. Compl. ¶¶ 24, 26; Pl. Rep. at 3.) As part of its publicity efforts, Fox created and released numerous theatrical and television trailers, which featured clips from the film. (Fox Amend Compl. ¶ 26.) On July 14, 2000, Fox released the theatrical motion picture "X–Men" to national audiences. (*Id.* ¶ 28.)

Fox estimates that the X–Men film has since generated $290 million in gross receipts from sales in the United States and abroad, grossed "tens of millions of dollars more" from sales of videotapes, digital versatile disks (DVDs), and associated merchandising, and that it will net a profit of approximately $160 million. (Pl. Rep. at 3; Rothman Decl. ¶ 14.) Fox also estimates that Marvel will receive approximately $6 million over the life of the film from "back end contingent compensation." (Pl. Rep. at 3–4; Rothman Decl. ¶ 16.) Describing X–Men as the "crown jewel of Fox's current properties," (Rothman Decl. ¶ 24), Fox intends to make it a "franchise film" by developing and producing sequels. (*Id.* ¶¶ 21–23.)

Fox has obtained copyright registrations for both the trailers and the film. (Fox Amend. Compl. ¶ 26, Ex. G.) Fox also created X–Men logos and associated artwork in connection with the film.[8] In particular, Fox has used a three-dimensional, metallic, futuristic letter "X," at the center of which the term "X–Men" is prominently placed. Fox has also used the letter "X"

logo without the superimposed "X–Men" term.[9] (*Id.* ¶ 27, Exs. H–I.)

## E. Creation and Promotion of the Mutant X Series

### 1. Mutant X Comic Book

Between November 1998 and May 2001, Marvel published a comic book series entitled Mutant X. This series featured Alex Summers (aka Havok), the mutant brother of Scott Summers (aka Cyclops), one of the original X–Men team members and a principal character in the X–Men film. (Witek Decl. ¶ 25, Ex. 14.) As depicted in the Mutant X comic book, Havok is transported to an alternate world and takes the name Mutant X. In that world, Havok encounters alternate versions of certain X–Men characters.[10]

### 2. Mutant X Series

#### a. Creation

In or about July 2000, as the X–Men film was being marketed and distributed, Marvel developed the idea for a live-action television series called Mutant X, which, according to Marvel, was intended to feature "new, never-before-seen, Marvel characters." (Arad Decl. ¶ 25; Declaration of Richard E. Ungar dated June 18, 2001 ("Ungar Decl.") ¶ 2.) Drawing from recent developments in science surrounding the mapping of the human genome and genetic engineering, Marvel decided to tell the story of "various young men and women who were part of genetic 'splicing' experiments conducted many years earlier." (Ungar Decl. ¶ 2.) "As a result of errors in

---

8. Hereinafter, the Court refers to the parties' respective logos and associated artwork as "logos."

9. Fox states that its logo design was "based on a door from one of the 'X–Men' sets designed by John Myhre, the film's production

designer." (Declaration of Robert Harper ("Harper Decl.") ¶ 5.)

10. Such characters include Marvel Woman (Jean Grey), Bloodstorm (Storm), the Fallen (Angel), and the Brute (Beast). (Witek Decl. ¶ 25.)

the experimentation, these genetically-augmented individuals underwent physical mutations, thereby developing unexpected abilities," and later, unexpected problems. (*Id.;* Genome X Television Series Concept, Ex. H to Arad Decl.) Because of such problems, the directors of the experiments realized a "product recall" was necessary. Adam, the principal character of the series and a scientist on the experiment team, "realized he had to leave the [team] and use his time and resources to try and locate these babies, who were now adults, either to cure them, help them cope, or assist them in understanding what to expect." (Arad Decl. ¶¶ 30–31.) On the other hand, Adam's partner, who is named Mason Eckhart, believed that the team had to cover its tracks by destroying or imprisoning the mutants. (*Id.* ¶ 31.) Thus, each episode would revolve around the search for a new mutant. (Declaration of Howard Chaykin ("Chaykin Decl.") ¶ 18.) As originally conceived, the series was to be called "Genome X." (Arad Decl. ¶ 28.)

Marvel developed a formal treatment [11] for the new series, and contacted Tribune about producing and distributing the show. (Declaration of Richard H. Askin, Jr. dated June 15, 2001 ("Askin Decl.") ¶ 6.) On August 9, 2000, Marvel and Tribune entered into a production and syndication agreement for a weekly, live-action television series of hour-long shows based on the Genome X concept.[12] However, Richard Askin, Tribune's president, disagreed with the choice of Genome X as the name of the series, because he was concerned that too few people in the target demographic would know what "genome" meant. (Askin Decl. ¶ 9.) Later, "after considerable discussion among representatives of Tribune and Marvel, [they] all eventually agreed upon the name 'Mutant X' for the television series." (Ungar Decl. ¶ 7.) Thereafter, an amended agreement was drafted to reflect this change, in which Marvel licensed the Mutant X name to Tribune for development of the television series. (Ex. D to Askin Decl.). On November 15, 2000, Tribune and Fireworks signed an agreement pursuant to which the two companies would cooperate on the financing, production, and distribution of the new series.[13] (Askin Decl. ¶ 10.)

According to defendants, "the characters portrayed and the stories to be told in the 'Mutant X' television series have absolutely no involvement whatsoever with [the Mutant X] comic book series . . . ." (Ungar Decl. ¶ 7.) Defendants hired an executive consultant responsible for refining the overall story for the series, based upon Marvel's original treatment, and for the writing of the scripts and supervision of others involved in that process. Part of the consultant's refining job, according to defendants, is to "eliminate any elements arguably reminiscent of the 'X–Men' property contained in [the] treatments." (Askin Decl. ¶ 11.) The record reflects that the characters and storylines in the show being produced as of the date of this Opin-

11. A "treatment" is an initial description of the background of the show and its characters, which is composed by the creators of the show and serves as a basis for preparation of a more detailed series "bible" by the scriptwriters. (Chaykin Decl. ¶¶ 16–17.)

12. Marvel reserved both animated television rights and feature film rights with respect to the Mutant X property. (Ex. C to Askin Decl.)

13. According to defendants, the Mutant X series is being produced entirely by Fireworks in Toronto, Canada, subject to certain approval rights of Tribune, and assisted by a production staff of close to 150 persons. (Askin Decl. ¶ 10.)

ion substantially vary from those presented in the initial concept and treatments.[14]

### b. Promotion

Notwithstanding the divergences in characters and storylines between the new Mutant X series and the X–Men Property or Mutant X comic book series, the record reflects that defendants' have made numerous references to the X–Men Property and the X–Men film in promoting the new series.

First, in or about January 2001, defendants placed advertisements in various entertainment industry publications promoting the proposed series. (Fox Amend. Compl. ¶ 31, Ex. J.) The advertisements featured a Mutant X logo developed by defendants, consisting of a three-dimensional green metallic X, at the center of which the term "Mutant X" is prominently placed. (*Id.*) Second, defendants have met with numerous television station licensees and advertisers throughout the United States in an effort to promote and license the new series. (Askin Decl. ¶¶ 17–19.) The sales presentation slides which were shown to these television industry personnel stated, *inter alia*, that the show is "[b]ased on the box office smash, *X–Men*," and makes reference to "X–Men The Movie" in connection with its $300 million in gross revenue and home video/DVD sales of $50 million "in its first weekend alone!" (Ex. B to Fox Amend. Compl.; Askin Decl. ¶ 21.) Third, defendants created certain a sales presentation videotape for the Mutant X series that appropriated clips from Fox's copyrighted X–Men film

and/or trailers, which, according to Fox, creates an association between the new series and the film.[15] (Fox Amend. Compl. ¶¶ 34, 35; Askin Decl. ¶ 22.) According to Fox, defendants have also created and distributed shorter versions of such sales presentation videotapes, including a compilation tape of shows produced by Tribune. (Fox Amend. Compl. ¶ 36.) Fourth, defendants have allegedly made certain public statements linking the new series to the X–Men film. (*Id.* ¶¶ 38, 39.)

Defendants' promotional efforts have been successful. According to Tribune, as of June 15, 2001, it had entered into broadcast licenses with television stations in 161 markets across the country, thus covering approximately 94 percent of all U.S. households. (Askin Decl. ¶ 28; Fox Amend. Compl. ¶ 37.) The company is currently in the process of selling advertising time for the first season of the show. (Askin Decl. ¶ 28.) Filming of the series began on June 4, 2001, and the director's cut of an initial episode, entitled "Russian Roulette," was finalized a few weeks later. (Declaration of Maura J. Wogan with Respect to the Mutant X Director's Rough Cut of "Russian Roulette" dated June 28, 2001 ("Wogan Decl. Roulette"), Ex. B.) The first episode of the series is scheduled to air in late September or early October 2001, with the rest of the fall lineup. (Askin Decl. ¶ 29.) Tribune has apparently committed to two years of production, with each year comprising 22 episodes, (Askin Decl. ¶ 8, Ex. C; Ungar Decl. ¶ 5, Ex. C.), and expects the series to run for at least five seasons, which, according to its calculations, will

---

14. Such changes, and the current characters and storylines, are considered in the discussion of Fox's contract claim. *See* Part III. A.1.c *infra.*

15. While the video footage in question was assembled by a freelance producer hired by Tribune, it was allegedly used in promotional

tapes displayed by both Tribune and Fireworks, and was sanctioned by Marvel. (Fox Amend. Compl. ¶¶ 34–35, 58–72; Askin Decl. ¶ 17; Declaration of Henry Urick dated June 17, 2001 ("Urick Decl.") ¶¶ 7, 8; Harper Decl. ¶¶ 13–15, Ex. I.)

likely result in net profits of $74.3 million. (Askin Decl. ¶¶ 32–33.)

### F. Instant Action

Fox filed the instant action, by order to show cause, on April 10, 2001, alleging claims for (i) breach of contract against Marvel; (ii) breach of the implied covenant of good faith and fair dealing against Marvel; (iii) tortious interference with contractual relations against Tribune and Fireworks; (iv) unfair competition and/or false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against all defendants; (v) copyright infringement, pursuant to 17 U.S.C. § 101 *et seq.*, against all defendants; (vi) deceptive trade practices, pursuant to New York General Business Law § 349 ("Section 349"), against all defendants; and (vii) common law unfair competition against all defendants. (Fox Amend. Compl. ¶¶ 49–72.) Within minutes of the filing of Fox's Complaint, Marvel filed a reciprocal declaratory judgment action against Fox, and the two actions were thereafter consolidated. (Marvel Compl.) Fox filed an Amended Complaint on May 16, 2001. (Fox Amend. Compl.) The instant motions followed, and oral argument was held on such motions on July 3, 2001.

## II. Motion to Dismiss

### A. Legal Standard

On a motion to dismiss, the Court must accept the factual allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (noting that factual allegations in complaint must be accepted as true on motion to dismiss); *Press v. Quick & Reilly, Inc.,* 218 F.3d 121, 128 (2d Cir.2000) (same). In deciding a motion under Rule 12(b)(6), the Court may consider "facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint, as well as [ ] matters of which judicial notice may be taken." [16] *Automated Salvage Transport, Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir.1998). Further, mere conclusory allegations without factual support are insufficient to survive a motion to dismiss. *See De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996) (citations omitted) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)."); *Lee v. State of New York Dep't of Correctional Servs.,* No. 97 Civ. 7112, 1999 WL 673339, at *14 (S.D.N.Y. Aug. 30, 1999) (same); *Donohue v. Teamsters Local 282 Welfare, Pension, Annuity, Job Training, and Vacation and Sick Leave Trust Funds,* 12 F.Supp.2d 273, 279 (E.D.N.Y.1998).

### B. Breach of Contract

#### 1. Choice of Law

▄ Fox states that California law should apply to its breach of contract claim, because (i) the 1993 Agreement was primarily negotiated in California and

---

**16.** The Court considers, in particular, the exhibits appended to the Complaint, including the 1993 Agreement, Tribune's Mutant X sales presentation videotape, the parties' respective logos, and Fox's copyright registrations, (Exs. A, D, G–J to Fox Amend. Compl.), as well as the August 9, 2000 Agreement between Marvel and Tribune, which is incorporated by reference in the Complaint.

drafted by attorneys practicing in California, and (ii) the "acts necessary for performance" [i.e. the creation of the X–Men film] took place in part in California. (Plaintiff's Memorandum of Law in Support of its Motion for a Preliminary Injunction ("Pl.Mem.") at 12 n. 1.) While defendants do not dispute Fox's facts regarding the Agreement's negotiation or performance, and do not address the choice of law issue directly in their papers with regard to the contract claim, they apply New York case law in support of their arguments.

The Court applies California law to the breach of contract claim.[17] Because jurisdiction in this case is based on diversity of citizenship as well as the presence of a federal question, we follow the choice of law rules of New York, the forum state. *See Totalplan Corp. of Am. v. Colborne,* 14 F.3d 824, 832 (2d Cir.1994) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). In contract matters, New York courts apply a "center of gravity" or "grouping of contacts" approach, pursuant to which courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1539 (2d Cir.1997) (citing *In re Allstate,* 81 N.Y.2d at 227, 597 N.Y.S.2d 904, 613 N.E.2d 936). The traditional choice of law factors, the places of contracting and performance, are given the heaviest weight in this analysis. *Id.* Here, the record reflects that the contract

was negotiated and signed in California, (Pl. Mem. at 12 n. 1; Declaration of Sandra Smokler dated June 23, 2001 ("Smokler Decl."), Exs. A–K), and, judging by the domicile of the parties, appears to have been performed in both California and New York. The states' interests, to the extent relevant, are evenly balanced. *Cf. In re Allstate,* 81 N.Y.2d at 226, 597 N.Y.S.2d 904, 613 N.E.2d 936 (noting that in contract cases involving only private economic interests, it may "be difficult to identify the competing 'policies' at stake, because the laws may differ only slightly, and evolve through the incremental process of common-law adjudication as a response to the facts presented"). However, given that the overall balance of negotiation and performance tips in favor of California, the Court applies California law to the breach of contract claim.

## 2. Scope of Marvel's Television Rights

Although Marvel reserved "all television rights" in Paragraph 8 of the Agreement, Fox must consent in writing to Marvel's "production, distribution, or exploitation of any live-action motion picture for free television exhibition, pay television exhibition, non-theatrical exhibition, or home video exhibition . . . ." (1993 Agreement ¶ 8.) In practice, this so-called "freeze" provision brings such live-action motion pictures within the ambit of Fox's rights under the Agreement, as it permits Fox to preclude Marvel from making such motion pictures when they are based on the X–Men Property. The scope of Marvel's television rights as elaborated within this framework

---

**17.** Under New York law, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co. and Stolarz,* 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). There are clear differences between New York and California common law rules with respect to breach of contract in general, and contract interpretation and performance in particular.

**14**

is at the heart of the parties' dispute, as they specifically disagree as to whether a live-action television series is encompassed by the freeze.

While both sides contend that the provision in question is unambiguous as written, they disagree as to what precise media the provision encompasses. Fox contends that Paragraph 8, as a whole, prohibits Marvel from exploiting the X–Men Property "in *any* audio-visual medium without either obtaining Fox's consent or providing Fox a right of first refusal . . . ." (Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint ("Pl.Opp.Dis.") at 5, 10.) Adopting a broad reading of the term "motion picture," Fox concludes that the phrase "live-action motion pictures for free television exhibition" effects a freeze on all of Marvel's live-action television rights, including the Mutant X live-action television series. Thus, Fox concludes, Marvel breached the Agreement when it chose to produce and market Mutant X without obtaining Fox's consent.

In support of its position, Fox relies on the context of the Agreement, in particular (i) the broad grant of rights in Paragraph 6 and character preemption rights in Exhibit A, (ii) the use of the term "motion picture" in Paragraph 8 and elsewhere in the Agreement,[18] and (iii) the "overriding purpose" of the Agreement to protect Fox against competition from other X–Men exploitations. (*Id.* at 4–11.) Fox also relies on certain definitions contained in the glossary of Fox's standard Option/Purchase Agreement (the "Fox Glossary") which, Fox claims, like the Option/Purchase Agreement itself, was incorporated by ref-

erence in Paragraph 18 of the 1993 Agreement. Specifically, Fox points out that the Fox Glossary defines: "Motion Picture" as "[p]ictures of any kind whatsoever . . . and their accompanying devices and processes whereby pictures . . . are recorded or otherwise preserved for . . . exhibition . . . by any means or media . . . in such manner as to appear in motion or sequence"; "Television Motion Picture" as a "Motion Picture primarily intended to be initially distributed for [t]elevision [e]xhibition"; Episode as an "individual Television Motion Picture which is part of a Television Series"; and "Television Series" as "related episodes intended to be distributed as a group . . . ." (Smokler Decl. ¶¶ 40–43, Ex. L.)

In contrast, defendants assert that the term "live-action motion picture" clearly refers to a "long-form movie," namely, a feature-length "movie of the week" or direct-to-video motion picture.[19] (Defendants' Joint Memorandum In Support of Cross Motion to Dismiss Plaintiff's Complaint ("Def.Mem.Dis.") at 9; Def. Mem. at 20.) Because live-action television series like Mutant X do not fall within such definition, then, defendants argue, Fox's breach of contract claim fails as a matter of law; Marvel may proceed with the series, and any other live-action television series whether or not based upon the X–Men Property, without prior written consent from Fox. (Def. Mem. Dis. at 7; Tr. at 39:10–24, 70:2–24.) Defendants assert that this interpretation is consistent with (i) the underlying bargain, whereby Fox contracted for limited rights to produce and distribute "theatrical motion pictures" based on the X–Men property, and Marvel

18. In this regard, Fox points out that, when the parties wanted to narrow the scope of the term "motion picture," they employed an adjectival modifier, as in (i) "theatrical motion pictures" (¶ 6), and (ii) "feature-length animated motion picture" (¶ 8.)

19. Fox counters that this interpretation is "a contrived layman's interpretation of the term 'motion picture' unsupported by case law or the plain meaning of the term as used in the contract." (Pl. Rep. at 14.)

"reserv[ed] all television rights" with the sole exception of live-action motion pictures for television, (ii) Marvel's superior bargaining power derived from its "special stature" in relation to the X–Men Property, (iii) the parties' separate treatment of television series rights in Paragraph 7(f) of the Agreement with respect to animated productions, and the distinction between "motion pictures and television series rights" made in Exhibit A,[20] and (iv) the overall sophistication of the parties. (Def. Mem. Dis. at 8–12; Def. Mem. at 20; Declaration of Jonathan D. Reichman Regarding Contract Interpretation dated June 17, 2001 ("Reichman Decl.") ¶ 50.)

Under California law, judgment on the pleadings in a breach of contract action may be appropriate when the terms of the contract at issue are unambiguous. This is a question of law, and the Court must determine whether any ambiguity exists by reading the terms in question in light of the overall context of the agreement. *Brinderson–Newberg Joint Venture v. Pacific Erectors, Inc.,* 971 F.2d 272, 277 (9th Cir.1992); *Brobeck, Phleger, & Harrison v. Telex Corp.,* 602 F.2d 866, 872 (9th Cir.1979) ("It is beyond question that every provision of a contract should be examined to determine the meaning and intention of the parties ... the meaning of words contained in a contract is to be determined not from a consideration of the words alone but from a reading of the

entire contract."). Under California's statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs its interpretation. "Such intent is to be inferred, if possible, solely from the written provisions of the contract ... The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage ... controls judicial interpretation." *Santisas v. Goodin,* 17 Cal.4th 599, 608, 71 Cal.Rptr.2d 830, 951 P.2d 399 (1998) (citations omitted). Where the parties' intentions are clear, and there is no reasonable basis for difference of opinion, no ambiguity exists.

In this case, the Court finds that the phrase "live-action motion picture for free television exhibition," read in the context of the provision in which it is contained and the Agreement as a whole, is ambiguous; in so finding, the Court disagrees with the positions of both parties. Given the varied uses of the term "motion picture" in the 1993 Agreement, and bearing in mind the alternative views presented by the parties concerning the meaning of the relevant phrase in the context of the Agreement,[21] the Court finds that there is a reasonable basis for a difference of opinion as to the scope of the freeze of Marvel's television rights in relation to the X–Men Property.[22] Accordingly, because de-

---

**20.** Fox acknowledges that the last paragraph of Exhibit A draws a distinction between "motion picture and television rights," but contends that it was the result of "poor drafting" by Marvel that cannot be used to interpret the main part of the Agreement. (Pl. Opp. Dis. at 8 n. 9.)

**21.** The Court notes that, read in the context of the entire Agreement, the term "motion picture," the salient term in the relevant provision, has a "special meaning" based on usage in the entertainment industry. *Santisas,* 17

Cal.4th at 608, 71 Cal.Rptr.2d 830, 951 P.2d 399. That meaning can only be determined by consideration of extrinsic evidence.

**22.** While the definitions in the Fox Glossary support a broad reading of the relevant phrase, it is far from clear that the Agreement incorporates such document, even considering the extrinsic evidence the parties have submitted. (1993 Agreement ¶ 18.) The Glossary neither is attached to the Agreement nor, apparently, was supplied during the negotiations. Although Marvel was aware of

fendants have failed to show that Fox can prove no facts in support of its breach of contract claim, the Court declines to dismiss this claim. Fox's success on its contract claim will therefore depend on an examination of extrinsic evidence.[23]

## C. Implied Covenant of Good Faith and Fair Dealing

Fox's second claim alleges that Marvel breached the implied covenant of good faith and fair dealing by (i) creating, producing, distributing, and marketing the Mutant X series without Fox's consent, and (ii) concealing its actions from Fox while attempting to mislead Fox about the nature of the series. (Fox Amend. Compl. ¶ 54.) Defendants contend that this claim should be dismissed as duplicative of Fox's breach of contract claim. (Def. Mem. Dis. at 16.)

Under California law, a claim for breach of the implied covenant of good faith and fair dealing is an outgrowth of alleged improper conduct by a defendant under a contract between the parties, and is designed to prevent a party from acting in bad faith to frustrate the contract's actual benefits. *See Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 349, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000) (stating that the covenant of good faith and fair dealing is "implied by law in every contract," and "cannot be endowed with an existence independent of its contractual underpinnings") (citation omitted); *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 690, 254 Cal.Rptr. 211, 765 P.2d 373 (1988) ("An allegation of breach of the implied covenant of good faith and fair dealing is an allegation of breach of an 'ex contractu' obligation, namely one arising out of the contract itself. The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes."). Such a claim must be dismissed as duplicative where it merely restates the contract claim. *See Guz*, 24 Cal.4th at 352, 100 Cal.Rptr.2d 352, 8 P.3d 1089. However, a claim for breach of the implied covenant may be sufficiently alleged where additional conduct by the defendant, separate and apart from the conduct resulting in the breach, frustrates the plaintiff's right to benefits due under the contract. *See Guz*, 24 Cal.4th at 353 n. 18, 100 Cal.Rptr.2d 352, 8 P.3d 1089; *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal.App.3d 1371, 1395 & n. 17, 272 Cal. Rptr. 387 (1990).

---

the existence of Fox's standard Option/Purchase Agreement and the Glossary, (Smokler Decl. ¶ 42; Deposition of Paul L. Brindze ("Brindze Dep.") at 26:25–27:4, 87:22–88:10), the lawyer for Marvel who negotiated the specific terms of the Agreement stated that he did not review the Glossary or the standard terms customarily used by Fox, and requested that the parties negotiate all the standard terms at a later date. (Brindze Dep. at 30:4–18.) The parties appear to have specifically negotiated the inclusion of a Glossary term, "Net Profits," in the October 2000 amended agreement. ("X–Men II" Amendment/Extension ¶ 2(c).) Paragraph 18 also leaves open what specifically would be incorporated into the Agreement, based, for example, on the stature of Marvel, which representatives of

both parties acknowledged was a factor in the negotiation process. (Reichman Decl. ¶¶ 45–49; Smokler Decl. ¶ 41.) Finally, the terms "motion picture" and "television series" are not capitalized in the Agreement as in the Glossary; defined terms are generally capitalized in entertainment industry documents, according to Marvel's lawyer. (Brindze Dep. at 119:8–15.) The Court notes, however, that Fox nevertheless may have relied on the Glossary's definitions in negotiating and drafting Paragraph 8 of the Agreement. (Smokler Decl. ¶ 40.)

**23.** Such extrinsic evidence is considered in the context of Fox's motion for preliminary injunction. *See* Part III.A, *infra*.

In this case, Fox's allegations of bad faith are merely conclusory. The Amended Complaint sets forth facts germane to a finding that defendants produced and distributed the Mutant X series without Fox's consent. (Fox Amend. Compl. ¶¶ 31–39.) However, Fox asserts no facts reflecting that Marvel acted in bad faith in creating, and authorizing the production of, the series. Fox states that it "found out about the proposed 'Mutant X' series not from [defendants] . . . but rather, from public articles and advertisements . . . ." (*Id.* ¶ 42.) However, such allegation does not suggest that Marvel purposely concealed its actions or somehow misled Fox. The fact that Marvel may not have discussed Mutant X with Fox at the early stages of its development may merely reflect its belief that its conduct did not implicate the 1993 Agreement. Moreover, the considerable publicity associated with the new series in the months following its creation, (Fox Amend. Compl. ¶ 41), runs counter to a finding of purposeful concealment. Because Fox has not alleged, and the record gives the Court no reason to infer, conduct beyond that which would constitute a breach of contract, the Court dismisses Fox's claim for breach of the implied covenant of good faith and fair dealing as duplicative of its contract claim.[24] *Cf. Trustees of Capital Elec. Co. Profit Sharing and Trust Fund v. Shearson Lehman Brothers, Inc.,* 221 Cal. App.3d 617, 625, 270 Cal.Rptr. 566 (1990) (dismissing claim for breach of the implied covenant without leave to amend where plaintiff failed to allege facts to support such claim).

## D. Tortious Interference

### 1. Choice of Law

The parties disagree as to which state's law should apply to the tortious interference claim. Fox asserts that California law should apply based on the domicile of Tribune and Fireworks and the location of the alleged tort; defendants claim that the domicile of Marvel and the purported conduct of the other defendants in New York dictates that New York law apply. (Pl. Opp. Dis. at 16 n. 16; Def. Mem. Dis. at 17 n. 7). In tort cases, New York courts apply the law of the jurisdiction with the greatest interest in the litigation. *Schultz v. Boy Scouts,* 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). In determining such interest, the courts look "almost exclusively" to the parties' domiciles and locus of the tort. *Id.; see also White v. ABCO Eng'g Corp.,* 221

24. This finding is supported by the Court's analysis of Fox's contract claim on its motion for preliminary injunction. *See* Part III.A *infra.* Where a defendant's actions do not breach a substantive provision of the contract at issue, such actions are not precluded by the covenant. *See Guz,* 24 Cal.4th at 350, 100 Cal.Rptr.2d 352, 8 P.3d 1089; *see also Careau,* 222 Cal.App.3d at 1395, 272 Cal.Rptr. 387 (noting that a breach of the implied covenant may only be found where defendant "demonstrates a failure or refusal to discharge contractual responsibilities"). Marvel's alleged improper use of the Mutant X name as the title of its series, as the sole conduct upon which Fox's breach of contract claim is likely to succeed, likewise is the only allegation upon which the implied covenant claim may succeed. Here, Fox does not allege that the title of the series, which is the only possibly misleading element, was ever concealed; it only alleges that Marvel mislead Fox as to the "nature of 'Mutant X'," which implicates the content of the series (e.g., characters, premise, etc.). Thus, even were Fox's allegations sufficient to survive a motion to dismiss, the existence of apposite additional, bad faith conduct is lacking. *Cf. Careau,* 222 Cal.App.3d at 1393–94, 272 Cal.Rptr. 387 (stating that although a breach of the implied covenant will always result in a breach of the underlying contract, "a breach of a consensual (i.e., an express or implied-in-fact) contract term will not necessarily constitute a breach of the covenant.")

F.3d 293, 301 (2d Cir.2000) (stating that "[i]f conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders") (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993)). Here, three of the four parties impacted by the tort, including the two allegedly responsible for committing it—Fox, Tribune, and Fireworks—are domiciled in California. The August 9, 2000 Agreement between Marvel and Tribune, and its amendment, which are both letter agreements, are directed to Rick Ungar, President of Marvel Characters Group, at Marvel studios in California, and probably signed by him there. (Exs. C and D to Askin Decl.) Moreover, although, as defendants point out, Tribune and Fireworks are alleged to have significant contacts with New York, (Fox Amend. Compl. ¶ 8), their actions in creating, producing and marketing the Mutant X series, (*Id.* ¶ 56), the record reflects, appear to have occurred in California, rather than New York.[25] Accordingly, the Court applies California law to Fox's tortious interference claim.

### 2. Merits

Fox asserts that Tribune and Fireworks tortiously interfered with the 1993 Agreement by participating in the creation, production, distribution, and marketing of the Mutant X series, despite their awareness of the existence and terms of the 1993 Agreement. (Fox Amend. Compl. ¶ 56.) Fox further asserts that "[a]s a direct and proximate result of [such] tortious interference ... [Fox] has suffered immediate and irreparable injury for which there is no adequate remedy at law." (*Id.* ¶ 57.)

In order to assert a claim for tortious interference with contract under California law, a plaintiff must allege (i) the existence of a valid contract, (ii) knowledge of the contract on the part of the defendant and intent to induce its breach, (iii) breach of the contract by a third party, (iv) causation, and (v) damages suffered as a result thereof. *JBL Enters. v. Jhirmack Enters.*, 698 F.2d 1011, 1019 (9th Cir.1983); *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1125, 270 Cal.Rptr. 1, 791 P.2d 587 (1990) (citing *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 765–66, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984)); *Farmers Ins. Exch. v. State*, 175 Cal.App.3d 494, 506, 221 Cal.Rptr. 225 (1986). With regard to the causation element, the plaintiff must allege that the defendant's actions were the proximate cause of the breach.[26]

25. The Mutant X series is being produced under Fireworks' auspices entirely in Toronto, Canada. (Askin Decl. ¶ 10.)

26. The elements of the tort are equivalent under New York law. *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993); La *Barte v. Seneca Resources Corp.*, 2001 WL 743261, at *3, 728 N.Y.S.2d 618 (4th Dep't 2001). As defendants point out, a small number of New York courts have stated that a plaintiff must allege and prove that there would not have been a breach "but for the activities of the defendant." *See Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 828 (2d Cir.1990); *Michele Pommier Models, Inc. v. Men Women N.Y. Model Management, Inc.*, 14 F.Supp.2d 331, 335–36 (S.D.N.Y.1998), *aff'd* 173 F.3d 845 (2d Cir.1999); *Four Finger Art Factory, Inc. v. DiNicola*, No. 99 Civ. 1259, 2001 WL 21248, at *6 (S.D.N.Y. Jan. 9, 2001); *Mina Inv. Holdings Ltd. v. Lefkowitz*, 184 F.R.D. 245, 255 (S.D.N.Y.1999); *Wash. Ave. Assocs., Inc. v. Euclid Equip. Inc.*, 229 A.D.2d 486, 645 N.Y.S.2d 511, 512 (2d Dep't 1996) (citing *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 119, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956)) (stating identical standard to *Kronos, supra*).

*Farmers,* 175 Cal.App.3d at 506, 221 Cal. Rptr. 225.

 In this case, Fox's claim is insufficient for three reasons. First, Fox has failed to allege that Tribune's and/or Fireworks' actions were taken with the intent to induce a breach of the 1993 Agreement. A defendant's mere knowledge of an agreement is not enough; Fox must allege and prove that Tribune and/or Fireworks intentionally interfered with Fox's rights under the Agreement without justification. Second, Fox fails to allege that Tribune's and/or Fireworks' actions were the proximate cause of Marvel's alleged breach; the Amended Complaint merely alleges that Fox suffered injury as a direct and proximate result of their actions. (Fox Amend. Compl. ¶ 57); Pl. Opp. Dis. at 16–17 (acknowledging that the causation element is properly pled under California law "by alleging that defendants were the proximate cause of the breach"). Third, even if Fox had sufficiently alleged these two elements, the facts asserted in the Amended Complaint do not support them, therefore requiring dismissal of the claim. Nothing in the Amended Complaint, or, for that matter, in the evidence submitted in support of Fox's motion for preliminary injunction, indicates that the actions of Tribune and/or Fireworks, in assisting in the creation and production of the new series, suggests that it was their intent to induce a breach. Nor do the facts alleged reflect that either Tribune or Fireworks was the proximate cause of the alleged breach.[27] Accordingly, the Court dismisses Fox's claim for tortious interference with contract.[28]

### E. Lanham Act

Fox's Lanham Act claim, for "unfair competition and false designation of origin," is grounded in its assertion that defendants "have sold 'Mutant X' by falsely associating it with Fox's 'X–Men'." (Pl. Rep. at 25.) Specifically, Fox asserts that defendants improperly marketed the new series by (i) infringing Fox's unregistered trademarks in its "unique logo" used in the film, and (ii) falsely promoting Mutant X as affiliated with the X–Men film.[29] It alleges that such promotion has caused potential purchasers to confuse the source of the series and the film, which is demonstrated by comments from such purchasers and articles from those in the enter-

---

**27.** Fox's reliance on *Rosenfeld, Meyer & Susman v. Cohen,* 146 Cal.App.3d 200, 224–25, 194 Cal.Rptr. 180 (1983) and *Olivet v. Frischling,* 104 Cal.App.3d 831, 837–38, 164 Cal. Rptr. 87 (1980) is inapposite, as the cited sections of those cases merely establish that a party to a contract may be held liable in tort for interference with his own contract if he conspires with a third party to breach it.

**28.** The evidence submitted by the parties on Fox's motion for preliminary injunction indicates that Tribune's president, Richard Askin, initiated the debate concerning change of the new series' name from "Genome X" to "Mutant X" by expressing his concern that the lay public would not comprehend the former. (Askin Decl. ¶ 9.) However, the decision to change the name to Mutant X was taken jointly by representatives of Tribune and Marvel.

(*Id.* (stating that Tribune "later agreed to change the title to 'Mutant X' "); Ungar Decl. ¶ 7 (stating that "we all eventually agreed upon the name 'Mutant X' for the television series").) Accordingly, even if it were properly alleged that Tribune had the intent to interfere, the record does not reflect that it was the proximate cause of the alleged breach of contract regarding the name of the show.

**29.** Defendants' improper promotion allegedly included: (i) showing sales presentation videotapes containing clips from the X–Men film and trailers, (ii) showing sales presentation slides referring to the film and its success, (iii) making public statements linking the two properties, (iv) calling their series Mutant X, and (v) using a confusingly similar logo. (Fox Amend. Compl. ¶¶ 31–41, 59; Pl. Opp. Dis. at 18–24.)

tainment industry stating that the two productions are related. (Fox Amend. Compl. ¶¶ 31–41, 59.)

▮▮▮ Section 43(a) prohibits the use of

any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin ... likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association ... with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

15 U.S.C. § 1125(a). It is a broad federal unfair competition provision which protects unregistered marks similar to the way that Section 32(1), 15 U.S.C. § 1114(1), protects registered marks. The section prohibits two forms of unfair competition: (i) the infringement of unregistered marks, names, and/or trade dress; and (ii) false advertising, that is, misleading or deceptive representations as to the quality or characteristics of the defendant's goods or services. *See* 4 *McCarthy on Trademarks and Unfair Competition* § 27:9 at 27:18–19 (2001). Under the trademark infringement prong of Section 43(a), upon which Fox bases its allegations concerning defendants' Mutant X logo, the applicable standard is substantially the same as that under Section 32(1); that is, a plaintiff must allege (i) the existence of a valid mark, and (ii) that the defendant's actions are likely to confuse the buying public, that is, "an appreciable number of ordinarily prudent purchasers . . . ." *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F.Supp.2d 277, 292 (S.D.N.Y.2000). Under the false advertising prong, the basis for Fox's allega-

tions concerning defendants' promotional activities more generally, a plaintiff must allege that the defendant made materially false or misleading statements of fact in advertisements or promotional materials that are likely to influence the purchasing decisions of ordinarily prudent purchasers. *Johnson & Johnson–Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir.1992); *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986) (citations omitted). Under either prong, the likelihood of confusion relates to either the source of the product or to affiliation with or sponsorship of the defendant by the plaintiff. *Gem Lab*, 90 F.Supp.2d at 292.

▮▮▮ The disposition of Fox's Lanham Act claim is grounded in its limited rights as a trademark licensee. Under the 1993 Agreement, specifically Paragraph 6 and Exhibit A as incorporated therein, Marvel licensed a set of rights to Fox which included the right to use Marvel's X–Men trademarks in commerce. Critically, however, Fox neither obtained a transfer of such trademarks nor the benefit of their associated goodwill, which had inured to Marvel over several decades.[30] Where no goodwill has been transferred with the license, a trademark licensee cannot independently develop its own goodwill in a licensed mark, as such goodwill inures solely to the benefit of the licensor. Moreover, even if the trademark licensee acquires goodwill as part of the license, and thereby enhances it through use of a licensed product, such goodwill cannot be the basis for a lawsuit against the licensor. As McCarthy states: "The licensee of a trademark is in the position of a renter of an apartment, who does not acquire real

---

[30] Fox's description of the scope of the grant of rights at oral argument is consistent in this regard. (Tr. at 14:21–24 ("The license to Fox is the right to make actual motion pictures based on the X–Men, and every piece of intellectual property that is needed to exercise that right has been granted to Fox.").)

estate ownership rights, no matter how long the tenancy. It is clear that the use of a mark by a person while such person was a licensee builds up no rights in the mark as against the licensor." 2 McCarthy § 18:52 at 18–88. This principle applies even where, as here, the licensee creates a new product on the basis of the license that enhances such goodwill. *See Cotton Ginny, Ltd. v. Cotton Gin, Inc.*, 691 F.Supp. 1347, 1354 (S.D.Fla.1988) (stating that in a licensing arrangement, the goodwill symbolized by the trademark is owned by the licensor, even though created by the licensee's efforts). "A licensee that wishes to create rights in a mark separate from the licensed mark has an affirmative obligation to choose a mark sufficiently different from the licensed mark to avoid confusion—the licensee trades upon the goodwill of the licensor at the licensee's peril." *Gem Lab*, 90 F.Supp.2d at 300 (citation and internal quotations omitted).

 Fox's principal X–Men logo consists of a three-dimensional, metallic, futuristic letter "X," at the center of which the name "X–Men" is prominently placed. Fox also uses the letter "X" logo without the superimposed "X–Men" name. (Fox Amend. Compl. ¶ 27, Ex. H.) As licensee of the X–Men mark, and the letter "X" insofar as it refers to such mark, Fox is unable to establish the existence of its own valid mark for the purposes of its Lanham Act claim. Such logos are not sufficiently distinct from the licensed mark so as to create independent trademark rights, as they are mere depictions of Marvel's trademarked name, which Marvel itself approved as the title of Fox's film pursuant to the 1993 Agreement. In fact, defendants assert that Fox's logos were derived from Marvel's own designs as they have

appeared in Marvel's comic books over the past several decades.[31] Defendants correctly point out that there is no derivative work concept in trademark law, as there is in copyright law, that would allow Fox to exploit the trademark license as provided under the 1993 Agreement, because such concept would contravene the principle that a trademark is to signal a single source of a product's origin to the relevant consumers. (Defendants' Joint Memorandum in Reply to Plaintiff's Response to Defendants' Motion to Dismiss ("Def.Rep.Dis.") at 9.)

 A similar analysis applies to Fox's false advertising claim, which is based on the purported goodwill Fox has captured in the X–Men film. Because Fox is a trademark licensee, its creation and distribution of the X–Men did not give Fox any additional trademark rights to the X–Men Property, or any element of it (e.g. character names), than that conveyed in the 1993 Agreement. Marvel did not assign its trademarks and copyrights in the X–Men Property in the 1993 Agreement; it granted Fox limited rights to produce a theatrical motion picture based upon such Property, long owned by Marvel. As defendants point out, "[a]ny success that Fox's film enjoyed simply strengthens *Marvel's* trademark rights in X–Men." (Def. Mem. Dis. at 23) (emphasis supplied); *cf. Nestle Holdings, Inc. v. Commissioner of Internal Revenue*, 152 F.3d 83, 88 (2d Cir.1998) (recognizing that a trademark licensee "has no reason to take steps to increase the value of a mark where the increased value will be realized by the owner"); 2 McCarthy § 18:52 at 18–88 (stating that the "properly licensed use by licensees will serve to fortify the legal and commercial strength of the li-

---

**31.** The substance of this allegation is considered in the following section, in the context of Fox's copyright claim.

censed mark"). Thus, it would be counterintuitive to conclude that goodwill inures to Fox as a result of its production of the film, because the film's constituent elements, namely, the set of X–Men names and marks, are owned by Marvel. The remedy available to Fox stemming from Marvel's alleged improper exploitation of the X–Men Property (e.g., calling the series Mutant X (Pl. Opp. Dis. at 21–22)) lies in contract rather than trademark law.[32] Likewise, as discussed *infra*, a copyright remedy may be available for the direct use of X–Men film footage.

Fox analogizes this case to earlier cases from this district where the defendant allegedly "passed off" his product as the plaintiff's product by using photographs or videos of the latter and referring to such product's success in promoting its own product. *See Sublime Prods., Inc. v. Gerber Prods. Inc,* 579 F.Supp. 248, 250–51 (S.D.N.Y.1984) (prohibiting defendant's further use, in promoting its lamp, of photographs of plaintiff's lamps and plaintiff's success at soliciting orders); *Elnicky Enters. v. Spotlight Presents, Inc.,* 1981 WL 48202, 213 U.S.P.Q. 855, 859–60 (S.D.N.Y. 1981) (finding that defendant's use of a videotape of plaintiff's singing robot, in which plaintiff had developed substantial

goodwill, "was clearly a misrepresentation of, and an attempt to 'palm off' its product"). However, in each of these cases, the plaintiff was not a trademark licensee, but an unrelated party who had independently developed goodwill in its product. The *Sublime* and *Elnicky* courts rightly concluded that the defendants' association of their products with the plaintiffs' products constituted unfair competition under Section 43(a). In contrast, in this case, Fox has accrued no goodwill in the X–Men film; if Fox's allegations are true, Marvel has merely associated its product with another of its licensed products, the X–Men film.[33]

Accordingly, the Court dismisses Fox's Lanham Act claim.

## F. Copyright

Fox claims that defendants have infringed its copyrights (i) in the X–Men film by using video clips from the film and trailers in promoting the Mutant X series, and (ii) in the X–Men logos created by Fox in connection with the film by creating and using a logo that is confusingly and deceptively similar. (Fox Amend. Compl. ¶ 64.) While defendants do not move to dismiss the copyright claim based on their alleged use of the video clips,[34] (Def. Rep. Dis. at

---

**32.** Fox's repeated reference, in its papers and at oral argument, to *Tri–Star Pictures, Inc. v. Unger,* 14 F.Supp.2d 339 (S.D.N.Y.1998), is misplaced. (Pl. Opp. Dis. at 22; Tr. at 10:21–11:5, 73:22–23.) In that case, the court found that the defendant's use of the film title "Return from the River Kwai" for its film about World War II prisoners of war unfairly competed with the plaintiffs' film on the same general subject entitled "Bridge On the River Kwai." Contrary to Fox's contention, the court's decision was explicitly grounded in the existence of a valid trademark in the movie title, and the plaintiffs' goodwill thereto accrued through secondary meaning. *Id.* at 347–54. Fox does not possess such goodwill in the instant case, as the alleged infringer is

the licensor of the rights in the product that allegedly has been infringed.

**33.** It is possible that, as Fox points out, certain individuals have been, or will be, confused, as to the source, sponsorship or affiliation of the Mutant X series. (Fox Amend. Compl. ¶¶ 38–41; Pl. Opp. Dis. at 22–24.) However, such confusion is not actionable as a matter of trademark law, because Mutant X and X–Men actually originate from the same source, Marvel.

**34.** Defendants nevertheless deny any infringement whatsoever of Fox's copyright in the 'X–Men' motion picture, taking the position that their infringement of Fox's copyright in the film and trailers is *de minimis* and prevalent

12 n. 8), they contend that Fox has failed to sufficiently allege a copyright claim with respect to the logos, because the logos are derivative works, and Fox allegedly failed to notify the Copyright Office thereof when applying for its registration certificate. (Def. Mem. Dis. at 26–28.)

 In order to plead a cause of action for copyright infringement, a plaintiff must allege: (i) which original works are the subject of the copyright claim; (ii) that the plaintiff owns the copyrights in those works; (iii) that the copyrights have been registered in accordance with the statute; and (iv) "by what acts during what time" the defendant infringed the copyright. *See Carell v. The Shubert Org.,* 104 F.Supp.2d 236, 250 (S.D.N.Y.2000) (citation omitted). The registration of a copyright is prima facie evidence of its validity. *Id.* at 251 n. 10. The Copyright Act requires that the registration application include "in the case of a compilation or derivative work,[35] an identification of any preexisting work or works that it is based on or incorporates, and a brief, general statement of the additional material covered by the copyright claim being registered." 17 U.S.C. § 409(9). Because a derivative work is only copyrightable to the extent that it is original, 17 U.S.C. § 103(b), it is important that the Copyright Office be informed of the preexisting work so that it may determine if the au-

thor of the derivative work has made an original contribution. *See Garner v. Sawgrass Mills Ltd. Partnership,* 1994 WL 829978, 35 U.S.P.Q.2d 1396, 1403 & n. 5 (D.Minn.1994). A knowing failure to provide such information, like other misstatements on a copyright application, is grounds for rendering the copyright registration unenforceable. *See G.B. Marketing USA, Inc. v. Gerolsteiner Brunnen GmbH,* 782 F.Supp. 763, 774–76 (W.D.N.Y. 1991) (dismissing copyright claim where record was clear that plaintiff knowingly failed to inform Copyright Office that work was derivative); *Russ Berrie & Co. Inc. v. Jerry Elsner Co., Inc.,* 482 F.Supp. 980, 987–88 (S.D.N.Y.1980) (same); *see also Whimsicality, Inc. v. Rubie's Costume Co., Inc.,* 891 F.2d 452, 455–56 (2d Cir.1989) (holding copyrights unenforceable because registrant knowingly misrepresented nature of work to Copyright Office).

 In this case, Fox has sufficiently alleged the elements of a copyright cause of action with respect to its copyrighted X–Men logos.[36] Moreover, defendants have failed to set forth sufficient grounds on its motion to dismiss to demonstrate that Fox's logos are derivative of Marvel's works. In particular, defendants do not describe, nor have they presented any evidence of, the existence and scope of Marvel's preexisting copyrights.[37] Nor does the record enable the Court to dis-

in the television industry, and therefore should be considered a "fair use." (Def. Rep. Dis. at 12 n. 8; Def. Mem. at 31.) For reasons stated with respect to Fox's preliminary injunction motion, the Court declines to find a "fair use" in this case. *See* Part III.B *infra.* Moreover, the fact that defendants have removed the allegedly infringing clips from their promotional materials and have recalled extant "pitch kits" from television stations is irrelevant to past infringement. (Def. Mem. at 30 & n. 20.)

35. "A 'derivative work' is a work based upon one or more preexisting works," and may

include any "form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101.

36. Fox has also attached the relevant copyright registrations to its Amended Complaint. (Ex. I to Fox Amend. Compl.)

37. A work is only derivative if it is based on preexisting copyrightable works. In fact, as the Ninth Circuit has stated, a work is only derivative if it "would be considered an infringing work if the material which it has derived from a preexisting work had been taken without ... consent." *Mirage Editions,*

cern which aspects of Fox's copyrighted artwork have allegedly been derived from Marvel's works.[38] Even were the Court to consider the affidavits and exhibits presented by defendants on the preliminary injunction motion and in their reply on the motion to dismiss, (Arad Decl. ¶¶ 39–44, Exs. O–Q; Ex. 1 to Def. Rep. Dis.) and conclude that Fox's works were derivative, dismissal of the claim would still be improper because (i) the record does not reflect that Fox knowingly omitted the derivative work classification from its copyright registration application,[39] and (ii) the work has the requisite degree of originality to be copyrightable as a derivative work, which right Fox obtained in the 1993 Agreement.[40]

### G. Common Law Unfair Competition

Fox claims that defendants have misappropriated Fox's labors and expenditures in violation of New York law by marketing and promoting Mutant X so as to create an improper association with the X–Men film. (Fox Amend. Compl. ¶¶ 70–72.) Defendants contend that the claim is barred for the same reasons as Fox's Lanham Act claim. (Def. Mem. Dis. at 30.)

 The New York law of unfair competition is broad and encompasses claims involving the misappropriation of a plaintiff's creative efforts as well as claims for false designation of origin. *See e.g., Roy Export Co. Establishment of Vaduz v. Columbia Broad. Sys.,* 672 F.2d 1095, 1105 (2d Cir.1982) (discussing misappropriation branch and its evolution); *Kregos v. Assoc. Press,* 3 F.3d 656, 666 (2d Cir.1993) (discussing both branches in the context of a copyright claim). "State law claims that rely on the misappropriation branch of unfair competition are preempted" by the

---

*Inc. v. Albuquerque A.R.T. Co.,* 856 F.2d 1341, 1343 (9th Cir.1988) (quoting 1 *Nimmer on Copyright* § 3.01 (1986)). Defendants have merely stated that Fox's copyrighted works are "derivative of Marvel's copyrighted X–Men comic books" or artwork, and, specifically, that a design similar to Fox's logo appeared in certain X–Men comic books. (Def. Mem. Dis. at 27; Def. Rep. at 10–11.)

38. Defendants suggest that the Court convert its motion with respect to the copyright claim into one for summary judgment. (Def. Mem. Dis. at 26 n. 13, 28 n. 14.) The Court declines to do so here. *Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000) ("[W]hen matters outside the pleadings are presented [on] a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material.") (citation and internal quotations omitted).

39. Defendants assert, in conclusory fashion, that Fox was "clearly aware" of, and disregarded, its obligation to register its logos as derivative because (i) it did so for the X–Men film, and (ii) Fox necessarily reviewed and relied upon Marvel's X–Men Property, including its artwork, in creating the logos based on the license provided in the 1993 Agreement. (Def. Rep. Dis. at 11.) Such allegations are insufficient to demonstrate the requisite intent. Fox's conduct with respect to its application concerning the X–Men film itself is inapposite to that respecting the logos, and fails to take into account the potentially differing judgments involved in registering same. Moreover, the mere fact that some of Marvel's artwork, in selected comics, may contain similar elements to Fox's logo does not indicate that Fox was aware of such artwork when it designed its logos.

40. "Any 'distinguishable variation' of a prior work will constitute sufficient originality to support a copyright if such variation is the product of the author's independent efforts, and is more than merely trivial." Nimmer § 2.01[B] at 2–12 (citing *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 250, 23 S.Ct. 298, 47 L.Ed. 460 (1903)). Fox's X–Men logos clearly meet such threshold standard. (Ex. H to Fox Amend. Compl.; Ex. 1 to Def. Rep. Dis.)

federal copyright laws. *Warner Bros. Inc. v. Am. Broad. Cos., Inc.*, 720 F.2d 231, 246 (2d Cir.1983) (citation omitted); *see also Arden v. Columbia Pictures Indus., Inc.*, 908 F.Supp. 1248, 1263 (S.D.N.Y.1995) (finding that a state law unfair competition claim that "[d]efendants misappropriated [plaintiff's work] for their own commercial gain and profit" sounds in misappropriation and is thereby preempted). Fox's allegation that defendants' actions in promoting Mutant X are an attempt to "free-rid[e] on Fox's creativity and investment" and "profit at Fox's expense by allowing Defendants to market 'Mutant X' for much less than it otherwise would have cost" is merely an allegation of copying. (Fox Amend. Compl. ¶¶ 4–5; Pl. Opp. Dis. at 30; Pl. Rep. at 25 n. 67.) Fox does not allege any additional facts that would warrant the maintenance of its unfair competition claim under a misappropriation theory. Thus, to the extent that Fox's unfair competition claim alleges misappropriation, the Court dismisses the claim as preempted by the copyright laws.

■ Although claims that allege a false designation of origin or false advertising "are not asserting rights equivalent to those protected by copyright and therefore do not encounter preemption," *Warner Bros.*, 720 F.2d at 246 (citing Nimmer §§ 1.01[B][1] n. 47, 2.12 n. 25 (1983)), this aspect of Fox's unfair competition claim is precluded for the same reasons as Fox's Lanham Act claim, namely, that Fox has accrued no goodwill in the X–Men film, logos, or the marks it was assigned under the 1993 Agreement that may have been misappropriated. *Cf. Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir.1997) ("Under New York law, common law unfair competition claims closely resemble Lanham Act claims except insofar as the state law claim may require an additional element of bad faith

or intent.") (citation omitted); *Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F.Supp. 1268, 1278 (S.D.N.Y.1994) (same); *Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*, 984 F.Supp. 768, 800 (S.D.N.Y.1997) (dismissing unfair competition claim and noting that the standards for a finding of unfair competition are substantially similar to those applied under the Lanham Act).

Accordingly, the Court dismisses Fox's common law unfair competition claim.

## H. Section 349

■ Fox's claim that defendants engaged in deceptive business practices under New York law through their promotional activities is unavailing for related reasons. (Fox Amend. Compl. ¶¶ 67–69.) Section 349 "was designed to protect consumers from various forms of consumer fraud and deception." *Smith v. Triad Mfg. Group, Inc.*, 255 A.D.2d 962, 681 N.Y.S.2d 710, 712 (4th Dep't 1998) (citation omitted). The section outlaws, *inter alia*, "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in [New York]." Section 349(a). In order to establish a violation of Section 349, a plaintiff must prove that: (i) the conduct of the defendant is consumer-oriented; (ii) the defendant is engaging in an act or practice that is deceptive or misleading in a material way; and (iii) the plaintiff has been injured by reason thereof. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). The New York Court of Appeals has defined a "deceptive act or practice" as a representation or omission "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* at 26, 623 N.Y.S.2d 529, 647 N.E.2d 741. In order to show conduct that is consumer oriented, a

plaintiff must plead and prove injury to the public generally, rather than to itself alone. *Int'l Sport Divers Ass'n, Inc. v. Marine Midland Bank, N.A.*, 25 F.Supp.2d 101, 114 (W.D.N.Y.1998) (citation omitted). "The conduct need not be repetitive or recurring, but the defendant's acts or practices must have a broad impact on consumers at large." *Id.* "[T]he gravamen of the Complaint must be consumer injury or harm to the public interest." *Something Old, Something New, Inc. v. QVC, Inc.*, No. 98 Civ. 7450, 1999 WL 1125063, at *11 (S.D.N.Y. Dec. 8, 1999) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir.1995)).

In this case, Fox's claim must fail because it does not allege, nor does the record reflect, that defendants' actions caused public harm.[41] In fact, as of the date of this Order, there has been very limited public exposure to Mutant X marketing. Defendants' sales presentation slides and videotapes were presented only to a handful of television station and advertising personnel, and according to defendants, all clips from, and references to the X–Men film have been removed from such sales materials. (Def. Mem. at 30 & n. 20; Ex. 3 to Def. Rep. Dis.) Defendants' original, green metallic Mutant X logo purportedly appeared in certain entertainment industry publications in early 2001. However, while

such publication may have infringed Fox's copyrights, any harm to the public as a result of its association of Mutant X with the X–Men is illusory, because the goodwill associated with the X–Men is Marvel's alone. The allegation of false association or "public confusion" upon which Fox's claim is based is therefore unavailing, (Pl. Rep. at 25 n. 69), as the public would merely be associating two Marvel products.[42] *Cf. Avon Prods.*, 984 F.Supp. at 800 (dismissing Section 349 claim on the ground that Lanham Act claim had been dismissed, and noting that the pleading standards under the two provisions are "substantially the same"). Defendants' alleged actions at most give rise to, and have in fact given rise to, a private contract dispute. Accordingly, the Court dismisses Fox's Section 349 claim.

## III. Motion for Preliminary Injunction

Fox moves for a preliminary injunction based on defendants' promotional activities as described above. Its position is succinctly expressed by Thomas Rothman, Chairman of Fox Filmed Entertainment, Fox's parent, as follows:

> "Mutant X" is a rip-off. That is precisely why the Defendants do not want to change the title or the substance of their series. On behalf of the hundreds of

---

**41.** Contrary to Fox's contention, the fact that certain news publications, most of which are from the entertainment trade, may have associated Mutant X with the X–Men film or Property is neither evidence of false advertising nor harm to consumers as a result of defendants' actions. (Pl. Opp. Dis. at 28–29.)

**42.** In the cases that Fox cites in support of its Section 349 claim, the courts found the possibility of public harm where the defendant unfairly competed with the plaintiff by misappropriating the latter's goodwill in a product to the detriment of the general public, a circumstance which is plainly not present here. *See In re Houbigant*, 914 F.Supp. 964, 984

(S.D.N.Y.1995) (finding that false advertising of consumer goods "with the intent to ... deceive consumers as to the source and origin of the products" would constitute the requisite public harm, if proved); *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1285 (S.D.N.Y.1990) (same); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 652 F.Supp. 1105, 1114 (S.D.N.Y.1987) (granting preliminary injunction on Section 349 and unfair competition claims with respect to title of consumer interest publication where defendant's "predatory conduct has plagued plaintiff with a loss of good will ...").

Fox employees who worked tirelessly over the years to make the "X–Men" film and who will continue to create its sequels, I respectfully implore the Court as a matter of law and basic justice to stop the Defendants before it is too late. (Rothman Decl. ¶ 8.) Accordingly, Fox proposes an order that (i) enjoins Marvel from taking any actions which directly or indirectly breach the 1993 Agreement, and (ii) enjoins all defendants from (a) creating a false association between Mutant X and the X–Men, and/or (b) infringing on the copyrighted or trademarked elements of the footage, trailers, and logos of the X–Men film. (Proposed Order Granting Injunctive Relief.) Fox's proposed order calls for, *inter alia*, (i) removal of the Mutant X title, the terms "Mutants," "New Mutants" or the letter "X," characters substantially similar to X–Men characters, and storylines referring to the existence of mutants or new mutants or other storylines or elements derived from the X–Men Property,[43] and (ii) prohibiting defendants' from using Fox's film clips or logos, or indicating in any way that their television series is related to the X–Men. (*Id.*) Downplaying the scope of its request, Fox asserts that it "is not asking that the [Mutant X] program be stopped entirely, only that Defendants modify it to eliminate the title, logo, and story elements that rightfully belong to Fox and denote 'Mutant X' as an X–Men program." [44] (Pl. Rep. at 14; *see also* Tr. at 10:21 to 14:5.)

 Under the traditional test for the award of equitable relief, the Court may grant a motion for preliminary injunction only upon a demonstration of (i) irreparable harm, and (ii) either (a) a likelihood of success on the merits of the case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the moving party. *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 779–80 (2d Cir.1994). "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir.1983) (citation and internal quotations omitted). Such harm must be actual and imminent, not remote and speculative, and may only be demonstrated where the amount of damages will be largely indeterminate, or not precisely calculable in monetary terms. *See Tom Doherty Assocs. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37 (2d Cir.1995) (noting that "irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial"); *Muze, Inc. v. Digital On–Demand, Inc.*, 123 F.Supp.2d 118, 131 (S.D.N.Y.2000); *Miramax Films v. Columbia Pictures Entertainment, Inc.*, 996 F.Supp. 294, 300 (S.D.N.Y.1998), *order vacated* (June 18, 1998). Moreover, where a preliminary in-

---

**43.** The specific elements that Fox wishes to be removed are discussed further in the following sections.

**44.** At oral argument, Fox characterized several of the changes that it believes are warranted in terms of "the features that Marvel ... identif[ied] in memo after memo all throughout the spring [of 2001], are too close and too reminiscent of the X–Men." (Tr. at 12:25–13:2, 74:24–75:23.) However, the memoranda in question do not indicate that Marvel's

requests for changes were grounded in the scope of the 1993 Agreement or principles of contract law. (Declaration of Dale Cendali ("Cendali Decl."), Exs. 19, 21–22, 23, 30.) Fox's conclusions thereto ignore Marvel's desires to create a product distinct from the X–Men and not alienate Fox, its partner in X–Men theatrical ventures. (Arad Decl. ¶¶ 33–35; Chaykin Decl. ¶¶ 9, 14–18; Tr. at 63:14–19.)

28

junction alters the status quo and "will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet a higher standard of substantial, or clear showing of, likelihood of success to obtain preliminary relief." *Tom Doherty*, 60 F.3d at 35; *see also Muze, Inc.*, 123 F.Supp.2d at 126. The Court addresses each of Fox's claims based on these guidelines, and in light of the Court's findings on defendants' motion to dismiss.

## A. Breach of Contract Claim

The Court applies the heightened standard for preliminary relief with respect to Fox's breach of contract claim. *Tom Doherty*, 60 F.3d at 34–35. Fox's casual characterization of its requested relief aside, the scope of the proposed injunction is broad and would clearly require defendants to change their proposed series in such a way that could not be undone after a trial on the merits.

### 1. Likelihood of Success

The Court has declined to dismiss Fox's breach of contract claim on the ground that the meaning of the phrase "live-action motion picture for free television exhibition" in Paragraph 8 of the 1993 Agreement is ambiguous when read in the context of the entire Agreement. *See* Part II.B.2 *supra*. In determining Fox's likelihood of success on this claim, the Court must first consider whether such phrase encompasses a live-action television series. If such a series is covered by the Agreement, the Court must then consider whether the Mutant X series violates the terms of the Agreement, based on Fox's specific allegations concerning the title, characters, and storylines of the new series.

### a. Scope of Marvel's Television Rights

In determining whether live-action television series are within the scope of Paragraph 8's freeze provision, the Court considers the extrinsic evidence submitted by the parties. *See Balfour v. Fresno Canal & Irr. Co.*, 109 Cal. 221, 41 P. 876 (1895) ("It is a settled rule that when the language employed is fairly susceptible of either one of two constructions contended for without doing violence to its usual and ordinary import an ambiguity arises where extrinsic evidence may be resorted to for the purpose of explaining the intention of the parties"); *Rainier Credit Co. v. Western Alliance Corp.*, 171 Cal.App.3d 255, 261, 217 Cal.Rptr. 291 (2d App. Dist.1985) ("Where a word or phrase can reasonably be understood in more than one way, the court must admit and consider extrinsic evidence to determine what the parties actually intended the word or phrase to mean"); *Int'l Brotherhood of Elec. Workers v. South. California Edison Co.*, 880 F.2d 104, 107 (9th Cir.1989) (same). Having examined such evidence, the Court agrees with Fox that live-action television series are within the scope of the freeze. The Court is particularly persuaded by the evidence presented by Fox concerning the (i) negotiation of the 1993 Agreement, including previous drafts thereto, and (ii) the understanding of the term "motion picture" in the entertainment industry with respect to television rights.

Fox has submitted testimony from those individuals involved in negotiating the terms of the 1993 Agreement on its behalf. Such evidence reveals that throughout the negotiations, the parties agreed that neither Fox nor Marvel could produce a live-action television series, or any other form of live-action television production, without the other's consent. The material terms of

the Agreement were negotiated by Melinda Benedek, then head of Business Affairs at Fox, and Ken Ziffren, an entertainment industry lawyer representing Marvel. (Declaration of Melinda Benedek dated June 23, 2001 ("Benedek Decl.") ¶ 8; Reichman Decl. ¶ 17.) According to Benedek, the agreement they reached in late June 1993 included, *inter alia,* a freeze on all live-action television exploitation. (Benedek Decl. ¶¶ 8–11.) In the initial draft of the 1993 Agreement, composed by Mark Resnick, then Senior Vice President of Business Affairs at Fox, and circulated on July 6, 1993, Fox was granted live-action television rights but could not exercise them without Marvel's written consent. No objections to such provision were made by Ziffren, or his partner Paul Brindze, who was also involved in the negotiating process. (Declaration of Mark Resnick dated June 25, 2001 ("Resnick Decl.") ¶¶ 7–10; Declaration of Sandra Smokler dated June 23, 2001 ("Smokler Decl.") ¶ 18, Ex. A; Reichman Decl. ¶¶ 23–24.) Resnick then turned over the final negotiating and drafting tasks to Sandra Smokler, an attorney in Fox's Legal Affairs Department, whose counterpart representing Marvel was Brindze. (*Id.* ¶ 9; Smokler Decl. ¶ 4; Reichman Decl. ¶ 21.) During the course of subsequent negotiations and drafts, the parties agreed that Marvel would reserve live-action television rights for itself, but in keeping with the general understanding of the parties, acknowledged that Marvel could not exercise such rights without Fox's written consent.[45] (Resnick Decl. ¶ 10; Smokler Decl. ¶¶ 19–28, Exs. B–H; Reichman Decl. ¶¶ 24–30) By September 12, 1993, the last date on which Fox received any written comments from Marvel, Marvel had not indicated a

disagreement with a freeze on all forms of live-action television rights. (Smokler Decl. ¶ 29, Ex. I.)

In the penultimate draft, circulated by Smokler on September 17, 1993, Paragraph 8 read, in pertinent part, as follows:

Marvel reserves all television rights ... However, prior to the reversion (if any) of the Rights ... Marvel shall not, without Fox's prior written consent ... exploit *any rights of live-action free television or pay television exhibition, any rights in connection with motion pictures made for non-theatrical exhibition or any rights in connection with motion pictures made for home video exhibition on cassettes or discs.*

(Smokler Decl. ¶ 30, Ex. J) (emphasis added). According to Fox, no comments were made to this version of Paragraph 8, and defendants do not provide evidence of any exchange. The changes that Fox subsequently made to this version in order to produce the final draft for signature were apparently the result of a grammatical change that was not discussed with Marvel. Specifically, Smokler states that she moved the term "motion picture," which she considered to be the subject of the relevant clause, to the front of the clause to yield its current form, which reads as follows:

Marvel reserves all television rights ... However, prior to the reversion (if any) of the Rights ... Marvel shall not, without Fox's prior written consent ... distribute or exploit or authorize the production, distribution or exploitation of *any live-action motion picture for free television exhibition, pay television exhibition, non-theatrical exhibition, or*

---

**45.** The Court disagrees with defendants that there was a "flip-flop" when the parties decided to have Marvel reserve the rights with a freeze. (Reichman Decl. ¶ 29.) The underlying bargain reached between Benedek and Ziffren, and solidified between Smokler and Brindze, had not changed.

*home video exhibition (on cassettes or discs) or any feature-length animated motion picture for non-theatrical exhibition or home video exhibition (on cassettes or discs).*

(1993 Agreement ¶ 8 (emphasis added); Smokler Decl. ¶ 31.)

Both Benedek and Smokler further assert that no one at Marvel ever expressed a desire to have live-action television series rights unfrozen. (Benedek Decl. ¶ 13; Smokler Decl. ¶ 15.) However, defendants assert that in the late stages of the negotiations, Marvel "was unwilling to agree to any broad freeze on television rights, given the 'X–Men' property's stature at the time and the extraordinary value of television rights." (Reichman Decl. ¶¶ 7, 22.) While defendants recognize that the typical film licensing deal for Fox includes a freeze on television rights, it claims that the repute of X–Men made it an "A-plus" property, which provided Marvel with significant leverage in the negotiations. (*Id.* ¶¶ 8–11.) Defendants also assert that live-action television rights were appreciating in value at the time of the negotiations because of the success of a Fox series called the "Might Morphin Power Rangers," which made such rights as important to Marvel as animated television rights, which Marvel was eventually able to secure pursuant to Paragraph 7(f) of the Agreement. Because Marvel perceived that there was no longer a "commercial distinction" between animated and live-action television series,

it believed that "it no longer made commercial sense to preserve the freedom to produce an 'X–Men' animated television series, yet give Fox veto power over a live-action television series." (Def. Mem. at 19–20; Reichman Decl. ¶¶ 33–34.)

While the record reflects that Marvel's stature may have enabled it to bargain successfully for substantial rights and monetary compensation in exchange for licensing the X–Men Property, defendants have failed to adduce support for their contention that Marvel's rights included unrestricted live-action television series rights.[46] Defendants have offered a logical explanation, in hindsight, for why Marvel may have wanted such rights in exclusivity. (Reichman Decl. ¶¶ 22, 33–34; Brindze Dep. at 104:24–105:16, 107:16–109:12.) However, the construction of the freeze in Paragraph 8 advanced by defendants contradicts the clear language of the draft agreements. Further, aside from Brindze's conclusory statement that he "requested" changes to eliminate live-action television series from the scope of the freeze after the penultimate draft was circulated, (Def. Mem. at 19; Reichman Decl. ¶ 36; Brindze Dep. at 105:19–24), and Brindze's and Ziffren's testimony concerning what they now believe Paragraph 8 to mean, (Reichman Decl. ¶¶ 36, 37, 39 (citing excerpts from Brindze Dep. and Ziffren Dep.)), defendants have failed to offer any concrete evidence to rebut the extensive evidence of the negotiation process pre-

46. One of defendants' experts notes that where material is potentially suitable for viewing by children and adults, such as the X–Men material, "the studio [i.e. Fox] would be expected to seek to acquire all motion picture rights, all television rights ... all 'home video' rights ... as well as merchandising rights and the right to create separate related productions (like video games) directed primarily to that market." (Declaration of Penelope Glass dated June 15, 2001 ("Glass Decl.") ¶ 9; *see also* Reichman Decl. ¶ 11 (citing Deposi-

tion of Kenneth Ziffren ("Ziffren Dep.") at 25:19–26:3).) Marvel was able to reserve all television rights, subject to the freeze at issue here, the right to make live-action motion pictures for non-theatrical exhibition home video subject to that freeze, and broad merchandising, publication, and approval rights. (1993 Agreement ¶¶ 7–8, 11–12.) Such reservations are consistent with, and probably as a result of, Marvel's previous successes in exploiting the X–Men Property in multiple media. (Reichman Decl. ¶ 13.)

sented by Fox, or Fox's contention that the fundamental understanding of the parties never changed.[47] Defendants' suggestion that Marvel only became aware of the importance of live-action television rights at the point of final negotiation appears implausible, (Brindze Dep. at 104:24–110:22), and their suggestion that Fox simply accommodated this view in the final draft of the Agreement ignores the possibility that Fox also may have attached significant value to such rights. *Id.* at 108:14–18 (recounting a theoretical discussion with Fox as follows: "I understand your concern about us making, you know, a two-hour movie … But you shouldn't care whether my series is animated or live-action. It's not a valuable distinction anymore."); *see also* Tr. at 72:9–12 (stating that if Power Rangers was a success, "[i]t would have made Fox all the more concerned about the potential for dilution to have a competing series"). Further, given the significant changes to the existing understanding of the parties that defendants' interpretation would have produced, and the ambiguity of the term "motion picture" in the industry acknowledged by Brindze,

(Brindze Dep. at 115:5–14; 138:15–22), the absence of correspondence concerning such change is noteworthy, and suggests that Fox's interpretation is the correct one.[48] (*See* Declaration of Ralph Kamon dated June 24, 2001 ("Kamon Decl.") ¶ 17.)

The Court also finds irrelevant to the instant case defendants' assertions that Marvel (i) had not negotiated a freeze of television series rights in a 1993 draft agreement with Columbia Pictures which preceded the negotiations in the instant case,[49] (ii) refused to agree to a freeze on live-action television series rights in 1992 when it licensed animated television series rights to Fox Children's Network, and (iii) produced a live-action movie of the week called Generation X in 1995 based on an X–Men comic book series of the same title without complaint from Fox, where Fox itself exhibited the show. (Reichman Decl. ¶¶ 14–16, 18; Def. Rep. Dis. at 1–2.)

The industry custom and practice concerning the use of the term "motion picture" in connection with television and other rights also supports Fox's claims. The record reflects that the term "motion picture," as commonly understood in the en-

47. The Court does not accept Marvel's conclusory statement that the final draft of the Agreement was circulated "following further discussions between Mr. Brindze and Ms. Smokler." (Reichman Decl. ¶ 35). In fact, Brindze testified that he did not remember any discussions with Fox representatives concerning changes which he allegedly requested should be made to Paragraph 8 of the penultimate draft. (Brindze Dep. at 103:3–7, 106:3–8, 107:5–12 ("We must have discussed it with Fox or those changes wouldn't have been made. The draft came from them. But I don't recall asking for this language."), 114:9–115:7.) Brindze also testified that to the extent that he did have such discussions, it is "highly unlikely" that he suggested any language for the final draft, as he had in previous drafts. (*Id.* at 113:2–6).

48. With respect to defendants' textual argument for a narrow reading of the relevant

phrase, the fact that Exhibit A of the Agreement, a document drafted entirely by Brindze, references motion picture and television rights separately, (Reichman Aff. ¶ 50), does not at all indicate the scope of the term "motion picture" *in connection* with television, which is the subject of the disputed clause in Paragraph 8. Also, the fact that Paragraph 7(f) of the Agreement specified television series rights in the context of a narrow grant does not suggest that the parties would have singled out such rights in the broader context of Paragraph 8.

49. Despite Marvel's retention of such rights, Marvel apparently was willing *not* to exercise its rights to live-action television series as long as Columbia held rights to produce theatrical motion pictures under the proposed agreement. (Brindze Dep. at 145:25–146:9.)

tertainment industry at the time of the Agreement, referred to "moving pictures," or more precisely to the exhibition of a series of pictures in rapid succession with objects shown in successive positions slightly changed so as to impart the impression of a continuous picture in which the objects move.[50] (Pl. Rep. at 15 (citing declarations).) According to the basic agreements between the studios and the talent guilds,[51] which are heavily negotiated, motion pictures are neither described in terms of length nor confined to certain media. (Kamon Decl. ¶¶ 35–38.) They include feature-length movies, short films, and programs or episodes of a series produced for television, cable, or satellite distribution.[52] (Id. ¶ 32.) In order to distinguish between types of motion pictures, studio contracts generally specify the medium in which a motion picture is to be exhibited, and/or the length of such picture. (Id. ¶ 33.) Such specification is evident in the 1993 Agreement; in Paragraph 6, the parties specified that Fox obtained rights necessary to produce "*theatrical* motion pictures;" and in Paragraph 8, they defined the freeze of animated non-theatrical rights to encompass "*feature-length* animated motion picture[s]." (1993 Agreement ¶¶ 6, 8.)

■■■■ Fox contends that when the parties agreed in Paragraph 8 that the freeze would also encompass "live-action motion pictures for free television exhibition," with no prescription for length, they intended the term to be construed broadly to refer to television series such as Mutant X. (Pl. Rep. at 16–17.) Without contesting the industry usage of the term "motion picture" as described above, defendants' two experts focus, respectively, on the phrases "live-action motion picture for free television exhibition" and "motion picture for television." Unfortunately, their focus on these phrases is no less abstract, and far less grounded, than Fox's discussion of the term "motion picture." The conclusion of the first expert, Todd Leavitt, that "live-action motion picture for free television exhibition" does not include television series is based solely on his opinion that Fox "would have been well aware of the distinction between made-for-television movies and television series production ... [and] would be expected to use the specific terms 'series', 'episode series programming', or similar words if that were its intent." (Declaration of Todd P. Leavitt dated June 5, 2001 ("Leavitt Decl.") ¶¶ 15–16, 21.) This assessment ignores the pos-

50. Such definition accords with the primary dictionary definition of "motion picture." Cendali Decl. ¶ 28, Ex. 28 (citing definitions from *Webster's Ninth New Collegiate Dictionary* (1988), *Wordsmyth: The Educational Dictionary–Thesaurus* (http://www.wordsmyth.net) (2000), *The Random House Dictionary of the English Language* (1973), and *Webster's Third New International Dictionary* (1993)); *see also The American Heritage Dictionary of the English Language* 1147, 1150 (2000) (defining "motion picture" as "a movie," and the primary meaning of "movie" as "[a] sequence of photographs projected on a screen with sufficient rapidity as to create the illusion of motion and continuity.") The secondary definition simply refers to the representation of a story by means of motion pictures. *See id.*

51. These include the Screen Actors Guild, Writers Guild of America, and Directors Guild of America. (Kamon Decl. ¶ 35.)

52. The Fox Glossary, whether or not incorporated into the Agreement, also reflects the broad nature of the industry definitions of the terms at issue here, including "motion picture," which is defined broadly, and "television series," which is defined as a subset of motion pictures. *See supra;* (Benedek Decl. ¶¶ 19–22 (noting that the definitions are "consistent with the way in which these terms are used in entertainment contracts"); Kamon Decl. ¶ 14 (stating that the Glossary "sets forth industry standard definitions").)

sibility, which is supported by a review of the negotiating history in this case, that Fox used a term commonly used in the industry to refer to a broad spectrum of rights, i.e. "motion picture," to encompass both types of productions. Moreover, although Leavitt provides a chronology of the negotiations, he neglects to discuss the nature of the underlying bargain, stating, in conclusory fashion that the editing change in the final draft clearly "limit[ed] the application of the consent requirement over free and pay television exhibition to the made-for-television movie genre." (*Id.* ¶¶ 22–24.) Also, in contrast to the examples Fox has provided of industry usage of the term "motion picture," Leavitt provides no examples of the use of the phrase "live action motion picture for free television exhibition" in an agreement or documents where its scope could be more clearly assessed.[53]

While carefully reasoned, the conclusions of defendants' second expert on this point, Penelope Glass, are also unpersuasive as applied here, because they are based on industry usage of the phrase "motion picture for television." Such

phrase does not appear in the 1993 Agreement. (Glass Decl. ¶¶ 13–20.) She sets forth a series of definitions that does not include "motion picture," but includes "motion picture for television," "television series," and a broad definition of "television rights;" then draws a distinction between "motion picture rights" and "television rights;" and, without any explanation, places "motion picture for television" in the former category, isolating it from "series television." (*Id.* ¶¶ 14–15.) It is difficult to see how such divisions could be generally accepted in the industry. Glass' analysis also gives scant consideration to the negotiating history or the nature of the underlying bargain in the instant case, or the broad nature of the term "motion picture" as employed in the entertainment industry,[54] which results in a general, and seemingly disconnected, conclusion that "Fox knew or should have known that the terms of … the 1993 Agreement … did not prohibit Marvel from exploiting the X–Men property as a television series." (*Id.* ¶ 6.)

Accordingly, for the foregoing reasons,[55] the Court finds that the 1993 Agreement's

**53.** Leavitt also argues that any ambiguity in the terms of the Agreement must be construed against the drafter, which is Fox here. (Leavitt Decl. ¶ 25.) This contention is unavailing. First, while there is a canon of construction which calls for construing an ambiguity against the party which caused the uncertainty to exist, such canon applies only as a tie breaker, when other canons fail to dispel uncertainty. *See* Cal. Civ.Code § 1654; *Decter v. Stevenson Properties*, 39 Cal.2d 407, 418, 247 P.2d 11 (1952) (stating that where reasonable inferences drawn from evidence remove any uncertainty concerning intention of the parties, rule that uncertainty must be resolved against party who causes it is not applicable); *cf. Vizcaino v. Microsoft Corp.*, 97 F.3d 1187, 1194 (9th Cir.1996) (stating that rule of contra proferentem is only applied if ambiguity in contract persists after resort to extrinsic evidence); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62–63, 115

S.Ct. 1212, 131 L.Ed.2d 76 (1995) (construing form contract containing arbitration clause against drafting party). Second, defendants' position contrasts with their reliance on Marvel's superior bargaining power in support of their interpretation of the Agreement.

**54.** Such considerations are crucial, considering that the term "motion picture" was inserted in front of the relevant clause in Paragraph 8 in the final draft of the 1993 Agreement, and, as a result of such grammatical shift, refers not only to free television exhibition, but also to pay television, non-theatrical, and home video exhibition. (1993 Agreement ¶ 8.)

**55.** The parties have introduced considerable evidence concerning the custom and practice of studios seeking to produce a theatrical motion picture based on a literary property. (Kamon Decl. ¶¶ 19–31; Benedek Decl. ¶¶ 14–

freeze on "live-action motion pictures for free television exhibition" encompasses television series rights. It now considers whether Mutant X itself falls within the scope of the Agreement, that is, to what extent, if at all, Marvel may have breached the Agreement by failing to obtain Fox's consent before creating and authorizing the production of the series.

### b. Mutant X Title

██ Fox claims that defendants breached the terms of the 1993 Agreement by calling the proposed series Mutant X. In so arguing, Fox relies on Paragraph 6 of the Agreement, which provides that the X–Men Property includes "all ... elements relating to the Property and the Characters," and gives Fox the "right to use the title (or subtitle or portion of the title) of the Property or any component of the Property as the title of any Picture or related exploitation." (Pl. Opp. Dis. at 11.) Fox also relies on Paragraph 6(d) of Exhibit A, which prohibits a third party from using titles derived from the X–Men Property as the title of a motion picture when Marvel licenses to such third party a character of the X–Universe that Fox has not previously claimed. (*Id.*) Without addressing Paragraph 6, defendants argue that Paragraph 6(d) of Exhibit A is inapplicable because (i) Marvel has not licensed any X–Universe characters to Tribune, and (ii)

Mutant X is not a motion picture. (Def. Mem. Dis. at 15–16.)

The Court agrees with defendants that Paragraph 6(d) of Exhibit A is inapposite to defendants' use of the Mutant X title, because the characters of the Mutant X series are extrinsic to the X–Men Property, a point discussed further in the next section. However, whether the Mutant X name is encompassed by Paragraph 6's grant of rights is a more difficult consideration. As Fox points out, the X–Men Property includes "all rights in the X–Men comic book series," and the grant of rights includes, *inter alia*, "all other elements related to the Property and Characters." (1993 Agreement ¶ 6.) Therefore, in order to decide this question, the Court must consider first, whether Mutant X is part of the X–Men Property, and second, whether "all other elements" related to such Property includes the name Mutant X.

The broad wording of the grant of rights in the 1993 Agreement indicates that Mutant X is part of the X–Men Property. Although the Mutant X comic book series was created and published after the Agreement was signed, it featured an X–Men character, Alex Summers (aka Havok), who first appeared in the original X–Men comic book series in 1969 and is the brother of Scott Summers (aka Cyclops), one of the original X–Men. The Mutant X comic book also included alternate versions

---

16; Leavitt Decl. ¶¶ 26–30; Glass Decl. ¶¶ 9–12.) The parties agree that freeze provisions, such as that in Paragraph 8 of the 1993 Agreement, are designed in part to protect the studios from competition that will reduce the value of the rights they have acquired. (Kamon Decl. ¶ 20 (noting the twofold purpose of studios that acquire rights to (i) prevent others from exploiting rights in non-theatrical media that could compromise the value of theatrical motion picture rights, and (ii) profit by exploiting the rights in other media should the film prove successful); Leavitt Decl. ¶ 26 (noting that the protections are designed to

"preclude impairment of such interests by subsequent exploitation of forms of artistic expression that might compete or interfere with [the studio's] interest" if the film contemplated by the agreement achieves commercial success).) However, the parties disagree as to whether a television series such as Mutant X would pose a competitive threat to a feature film. (Kamon Decl. ¶¶ 21–26; Leavitt Decl. ¶¶ 27–30.) The Court is unable to conclude that the evidence presented militates in favor of either position concerning the scope of the freeze of rights in this case.

of other X–Men characters. (Fox Amend. Compl. ¶ 19; Witek Decl. ¶ 25; *see also* Part I.E., *supra.*) For this reason, the Mutant X comic book series is regarded as one of the X–Men family of comics.[56] (Witek Decl. ¶¶ 23–25; Deposition of William Jemas at 38:16–23.) Moreover, the Agreement does not explicitly limit the grant of rights in the X–Men Property, other than the restrictions on the use of characters and origin stories in Exhibit A, and contemplates a series of theatrical motion pictures to be produced over an indefinite time by Fox.[57] Thus, there is no indication

in the Agreement, and the Court sees no reason to infer, that Fox's rights were limited to only that portion of the X–Men Property that had been created as of the date of the Agreement. Rather, Fox acquired rights to the Property which it required to produce and distribute X–Men films from the signing of the Agreement forward, including that portion of the Property produced following such signing.[58] Accordingly, as a publication integrated with the X–Men comic book series, the Mutant X series is part of the X–Men Property. The Court finds, in turn, that

56. Fox also points out that advertisements for Mutant X comic books appeared in other comics of the X–Men Universe. (Cendali Decl. ¶ 8, Ex. 8.)

57. Even Exhibit A contemplates that characters developed after the Agreement was signed would be part of the X–Universe. (Ex. A to 1993 Agreement ¶ 4 (stating that the X–Universe includes "any character which has been, is now, *or will be between now and the date of Fox's notice [of preemption]*, a regular featured character" in one of seven comic books)) (emphasis added).

58. Defendants do not directly address whether the name Mutant X falls within the scope of the grant of rights under Paragraph 6, and, at oral argument, did not contest Fox's assertion that the grant could include rights in titles following the Agreement. (Tr. at 4:13–5:6.) However, Marvel's Complaint states that the 1993 Agreement granted Fox certain rights "to the then-existing X–Men characters and stories as reflected in seven then-existing comic book series." (Marvel Compl. ¶ 27.) Also, in certain of their submissions, to which defendants direct the Court in their motion to dismiss papers, defendants appear to take a narrow view of the scope of the Property conveyed that would exclude the Mutant X name. In his declaration, Avi Arad, one of the creators of the Mutant X series, omits any mention of the Mutant X comic books in his description of Marvel's "X–Men world" of titles. (Arad Decl. ¶ 8.) As noted *supra*, any contention that such title is not part of the X–Men family of comic books is unavailing.

At his deposition, Brindze suggested that Exhibit A's limitations on the grant of rights

in X–Men characters also encompassed the other rights specified in Paragraph 6. (Brindze Dep. at 35:1–17; *see also* Def. Rep. Dis. at 5 (stating that Exhibit A limits the license to "far less than the totality of 'X–Men' characters *and stories* developed by Marvel") (emphasis added).) While his discussion of this issue is far from clear, Brindze's conclusion appears to be based on the notion that the scope of the Property conveyed is wholly dependent upon the characters used. (*Id.* at 35:12–15 ("[I]n defining the characters, you are defining the scope of the property. There were X–Men characters and X–Men properties that were not being transferred.").) However, the X–Men Property includes all rights in the "X–Men comic book series," not merely the characters. While Exhibit A's limitations on characters may limit Fox's choice of origin stories derived from the characters, there is no reason to believe that Exhibit A defines the universe of the other rights specified in Paragraph 6, such as the names of comic book titles. In fact, defendants' discussion of the operation of Exhibit A supports this finding. (Reichman Decl. ¶¶ 51–60 (in section entitled "The Grant of Rights to Fox Did Not Include All X–Men Characters *and X–Men Comic Book Titles*," discussing limitation on Fox's exploitation of X–Men characters only) (emphasis added); *see also* Memorandum from Rick Ungar to David Berson dated Jan. 17, 2001, Ex. 18 to Cendali Decl. (discussing separately the grant of rights in Paragraph 6 and the eligible characters in Exhibit A, and stating that Fox was granted "all rights in and to the 'X–Men' comic book series for the media contemplated in the agreement").)

the Mutant X name, as an "element related to the Property," was included in the conveyance of all rights in such Property to Fox, a finding which is strengthened by the Agreement's additional specification that the grant permits Fox to use the title of any portion of the Property as the title of its films or related exploitations. (1993 Agreement ¶ 6.) Because the Mutant X name was included in such conveyance, and Marvel's rights in live-action television series based on the Property are subject to the freeze of Paragraph 8, the Court finds that Fox has demonstrated a clear likelihood of success for a claim of breach of contract grounded in defendants' use of the Mutant X name as the title of the proposed series.

In its motion papers and at oral argument, Fox asserted that defendants' use of either "Mutant" or "X," standing alone in the title of the series, would constitute a breach of the Agreement. This contention is unavailing. The term "mutant" is often employed in science fiction literature and media to describe individuals or entities with special powers.[59] Such individuals or entities are also depicted without the explicit use of the word "mutant."[60] Likewise, the letter "X" is commonly used to designate an unknown or mysterious quality or entity. (Arad Decl. ¶ 19; Declara-

tion of Richard E. Unger dated June 18, 2001 ("Unger Decl.") ¶ 7 (stating that, in changing the original Genome X title, Marvel wished to retain the "X" because it conveys mystery or the unknown).) Marvel has used "X" in comic books other than those of the X–Men series to indicate such a quality, in particular "Earth X," "Universe X," "X–51," and a planned series, "Paradise X." (Arad Decl. ¶¶ 20–23, Exs. E–G; Unger Decl. ¶ 7.) Fox itself uses the letter for such a designation in certain of its own television series, including the "X Files," which treats supernatural and unknown elements or entities, and the upcoming reality television mystery "Murder in Small Town X." (Wogan Decl. ¶ 24, Ex. G; Chernin Dep. at 30:7–32:17.) Under a similar rationale, the fact that either the term "mutant" or the letter "X" is used in the title of a story concerning mutants would not constitute a breach, as Fox suggests. (Tr. at 29:6–9; 31:13–16.)

### c. Characters and Storylines

▮ The Court arrives at a different conclusion with regard to that portion of Fox's breach of contract claim based on the characters and storylines of the Mutant X series.

---

**59.** The dictionary definition of "mutant" reflects such pervasiveness. *See, e.g., The American Heritage Dictionary of the English Language* 1160 (2000) (defining "mutant" as "[a]n individual, organism, or new genetic character arising or resulting from mutation"); *Webster's II New Riverside University Dictionary* 779 (1994) (defining same as "[a]n organism or individual differing from the parental strain or strains as a result of mutation"); *Wordsmyth: The Educational Dictionary–Thesaurus* (http://www.wordsmyth.net) (defining same as "an organism that differs from its parents as a result of mutation"; syn. "monster").

**60.** Defendants point out that two current Fox television series feature mutant-like individuals. "Dark Angel" features a genetically engineered human with superpowers as protagonist, who has been referred to as a mutant in the press, a characterization with which the Chief Operating Officer of News Corp., Fox's parent, agrees. (Deposition of Peter Chernin ("Chernin Dep.") at 21:11–22:16; 23:5–21; 26:18–25.) "X Files" also apparently involves the paranormal and investigations of mutant entities. (*Id.* at 30:25–31:3; Deposition of Richard Ungar at 253:23–254:8.) Also, virtually all of the characters in Marvel's universe of comics have been endowed with special powers which set them apart from ordinary humans. (Marvel Compl. ¶ 12.)

#### i. Characters

Fox claims that Marvel has breached the 1993 Agreement because of "numerous similarities" between the Mutant X characters and those licensed to Fox and portrayed in the "X–Men" film, such that the two share virtually the "very same core characters." (Fox Amend. Compl. ¶ 46; Pl. Mem. at 14; Pl. Opp. Dis. at 13.) In so arguing, Fox presents evidence concerning (i) defendants' original conception of the Mutant X characters, as reflected in an early treatment and comments by certain of the creators, and (ii) the overlap in names and traits between the X–Men and Mutant X characters.

Fox points out that a Mutant X treatment draft revised in August 2000 included references to X–Men characters that appear in the X–Men film, including Charles Xavier (aka Professor X) and Senator Robert Kelly, the principal opponent of mutants within the U.S. Congress.[61] (Cendali Decl. ¶ 4, Ex. 4; Chaykin Decl. ¶ 10, Ex. B.) Fox also points to communications, during the development of Mutant X, between representatives of defendants, indicating that they intended to adopt characteristics of certain X–Men characters in creating the Mutant X characters. (Id. ¶¶ 5, 9–12, 22(a), (e), 23, Exs. 5, 9–12, 22. 23.) Although Fox acknowledges that Marvel has since removed all direct references to X–Men characters,[62] it nevertheless takes the position that the current characters are derived from the X–Men characters. Fox first contends that defen-

dants use of the terms "mutant" or "New Mutants" to describe the characters conveys an impermissibly strong association with the X–Men. Second, Fox asserts that, on an individual level, there are extensive similarities between (Mutant X character first) (i) Adam and Professor Xavier, (ii) Shalimar Fox and Wolverine, (iii) Brennan Mulwray and Storm and Jubilee, (iv) Jesse Kilmartin and Shadowcat, Colossus and the Blob, and (v) Emma Delauro and Jean Grey and Rogue. (Witek Decl. ¶¶ 45–60.) Defendants defend their "mutant" denominations on the ground that mutants are pervasive in stories of the science fiction genre, and in the Marvel Universe of characters in particular. They also claim that they have removed all similarities between the Mutant X characters and the X–Men in order to make the former a truly original product. At present, defendants state, the characters from the two works share at most generic similarities that are present in several works of the same genre. Finally, defendants state that the process of producing a television series is "immensely plastic, and the 'Mutant X' story is constantly being molded, revised, and reinterpreted up until the moment that the camera begins to roll." (Chaykin Decl. ¶ 11.) Accordingly, "every element of the bible and scripts is subject to change at any time." (Id.)

As an initial matter, the Court finds that defendants' use of the terms "mutant" or "new mutants" to refer to the Mutant X characters does not constitute a breach of the 1993 Agreement. As discussed in the

61. While Fox refers to the document in question as a series bible, defendants' submissions show it to be a treatment. (Cendali Decl. ¶ 4; Chaykin Decl. ¶ 17, Exs. B, C (showing Ex. C to be the initial series bible).)

62. For example, Howard Chaykin, Mutant X's principal writer states his first changes were to remove all references to Professor Xavier, his "Academy," the "Office of Mutant Re-

search," and the "Mutant Registration Act." (Chaykin Decl. ¶ 17.) Chaykin also states that he changed the name of the principal character, Adam Xero or Zero, to Adam. (Id. ¶ 31.) References to Wolverine in the description of the Shalimar Fox character, upon which Fox has placed emphasis in its arguments, were also removed. (Id., Exs. C, D; Tr. at 6:15–22.)

previous section, the term "mutant" is commonly used to describe individuals or entities with special powers, which are commonplace in science fiction literature and media. Moreover, while Fox claims that defendants' reference to the Mutant X characters as "new mutants" clearly suggests the X–Men by begging the question, "Who are the old mutants?," (Witek Decl. ¶ 35; Tr. at 9:10–12), the Mutant X characters are clearly a new form of mutant, that is "those who had been genetically enhanced by [Genomex]." (Chaykin Dep. at 93:23–25; Series Bible dated June 13, 2001 ("Series Bible")), Ex. D to Chaykin Decl., at 15–16 (stating that the term refers to the "Children of Genomex" who were "anomalies"). One of Fox's experts acknowledges that the available scripts of the new series refer to "mutants as a whole (i.e. the individuals created by the Genomex program, and to the Mutant X team.") (Witek Decl. ¶ 34.) Adopting this view, the "old" mutants may include the X–Men, as well as other mutant individuals or entities who were created before the advent of genome mapping or sophisticated genetic engineering. However, were defendants to either (i) denominate Mutant X characters as a group as the "New Mutants," as they appear to have done in the series' initial treatments and bibles (Ex. B, C to Chaykin Decl.), or, (ii) as noted *infra*, entitle the series "New Mutants," then such designation would impinge on Fox's contractual rights, as the "New Mutants" was the title of a discontinued X–Men comic book series that was a spinoff of the X–Men. (Witek Decl. ¶ 24; Arad Decl. ¶ 8); *see also Ultimate X–Men* at 82–83, 100–01.

Further, the Court agrees with defendants that the Mutant X characters are distinct from those portrayed in the X–Men Property and the X–Men film. Fox describes its character similarities at a general level of abstraction, emphasizing basic similarities common to many characters, and ignoring pronounced differences.[63] To begin with, the characters' names are entirely distinct from one another, and the Mutant X characters neither have code names such as "Professor X," "Wolverine," "Storm," or "Rogue,"[64] nor do they wear comic-book style costumes. (*See* Askin Decl. ¶ 7; Chaykin Decl. ¶¶ 12, 41–43 (describing differences in costumes).) Adam and Professor Xavier are each intelligent leaders of a group of mutants with a mysterious past, and each has spent money to build a form of

63. Although Fox has not alleged a copyright claim based on the characters or storylines, an analogy to copyright law is helpful in discerning and assessing the similarities in the instant case. In the context of a copyright claim, describing elements of two works at a general level of abstraction is bound to yield some similarities, but only at the level of unprotectible ideas. The more narrow the level of abstraction, the more likely that the elements extracted from a work will consist of protectible expression. *See Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (Hand, J.) ("[U]pon any work a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended."); *Kaplan v. The Stock Market Photo Agency*, 133 F.Supp.2d 317, 324 (S.D.N.Y.2001) (finding, in dismissing plaintiff's copyright infringement claim, that plaintiff grounded his claim on an overgeneralized level of abstraction). In the instant case, Fox bases its contract claims on similarities common to characters and stories in the comic book and science fiction genres.

64. Adam is not the real name of the Mutant X group's leader; his real name remains a mystery. (Chaykin Decl. ¶ 31.)

sanctuary for them. However, intelligent, older leaders are far from unique to the X–Men.[65] Further, the differences in character traits are substantial. Unlike Professor Xavier, Adam is not a mutant, is of middle rather than advanced age, and is physically active rather than confined to a wheelchair. (Marschall Decl. ¶ 27(a).) While Adam has a powerful memory and ability to reason, Professor Xavier excels as a telepath. (Witek Decl. ¶ 47.) As to Shalimar Fox and Wolverine, their only common ground is a linkage to the animal kingdom, and the occasional recklessness and acute sensory perception derived therefrom. (*Id.* ¶ 52.) Otherwise, the differences are overwhelming. While Wolverine is a "loner and rough neck with a vicious temper," Shalimar is a "sexy, extroverted blonde with a kittenish sense of humor." (Chaykin Decl. ¶ 36(b).) While Wolverine has the ability to heal himself almost instantaneously and has an implanted metal skeleton, including distinctive metal claws, Shalimar is graced with superhuman strength and speed, and excellent night vision.[66] (*Id.*) Further, while Brennan Mulwray's ability to shoot lightning bolts and sparks from his hands is similar to Storm's ability to generate lightning by controlling the weather, and Jubilee, who can create fireworks with her hands, the power to generate and discharge electricity is commonplace in comic book and science fiction genres.[67] (Marsc-

hall Decl. ¶ 27(d); Chaykin Decl. ¶ 36(e).) Moreover, Brennan is male (both Storm and Jubilee are female), is unable to fly (Storm flies), can use his powers anywhere (Storm must use her powers outside), and his power is limited to sparks and bolts (Jubilee creates fireworks in various shapes, colors, and strengths and Storm controls all forms of weather). (Series Bible; X–Men Character Descriptions, Ex. C to Witek Decl.) Jesse Kilmartin's power to change his body density may resemble certain powers held by Shadowcat, who can pass through solid objects, and Colossus, who can turn his body into steel. However, the ability to change body form or density is a common trait of superheroes; defendants point out, for example, that the Vision, a character from the Avengers comic book series, like Jesse, could make himself intangible or impermeable. (Marschall Decl. ¶ 27(e); Chaykin Decl. ¶ 36(d).) Also, Fox's assertion regarding Brennan's similarities to Colossus is wholly conclusory, and the record does not reflect that Colossus is part of the X–Universe of characters to which Fox obtained rights.[68] Finally, contrary to Fox's contention, Emma Delauro's powers are not comparable to those of Rogue or Jean Grey, beyond the fact that her powers are mental rather than physical. Emma is a so-called "telempath" or "empath," which allows her to sense the emotions of others

---

65. Defendants point to Reed Richards of the Fantastic Four, another Marvel comic book series, Hannibal Smith of the television series "The A–Team," and Charlie of the series and film "Charlie's Angels." (Declaration of Rick Marschall dated June 18, 2001 ("Marschall Decl.") ¶ 27(a); Chaykin Decl. ¶ 36(a).)

66. Defendants compare Shalimar Fox to Tigra, who was featured in Marvel's "Avengers" comic book series, as they both possess superhuman strength, agility, endurance, and sensory acuity. (Marschall Decl. ¶ 27(b).)

67. Defendants point to two other Marvel characters: Electro, who, like Brennan, initially used his powers in illicit activities, and Aguila, both of whom can generate electricity and expel electric bolts at their opponents. (Marschall Decl. ¶ 27(d).)

68. The Court also finds that the comparison between Brennan and the Blob is inapposite. The Blob merely has a resilient body that is impenetrable to foreign projectiles such as bullets, or even torpedoes. (Witek Decl. ¶ 57.)

and compel others to feel a particular way, while Jean Grey, like Professor Xavier, is telepathic (read minds) and also telekinetic (move objects), and Rogue absorbs the life force, or mutant powers, of anyone she touches. (Marschall Decl. ¶ 27(c); Witek Decl. ¶¶ 57–59; Marvel Compl. ¶ 20.) Defendants also point out that Emma is outgoing, while Rogue is "almost obsessively shy" and Jean Grey is considered an intellectual.[69] (Chaykin Decl. ¶ 36(c).)

More generally, defendants also point out differences in overall character portrayal. Specifically, the Mutant X characters do not display their special abilities at each available opportunity, as is typical of the X–Men film characters, because the television series revolves less around the characters' mutations than their personal stories and individual identities. (Chaykin Decl. ¶¶ 23–24, 34.) Because the Mutant X series is designed to be "dramatically lighter than the 'X–Men' and most comic books," the Mutant X characters often have fun, e.g. by using their special abili-

ties to play light-hearted pranks on fellow team members, activity which is not reflected in the X–Men Property.[70] (*Id.* ¶ 25.)

Because the Mutant X characters are not based on or derived from the X–Men Property licensed to Fox in the 1993 Agreement, the Court finds that Fox is not likely to succeed on its contract claim to the extent it is grounded in similarities between such characters and licensed X–Men characters.

### ii. Storylines

Fox points out that it has the exclusive right to X–Men storylines because Paragraph 6 of the 1993 Agreement includes within the definition of the X–Men Property "all storylines from individual comic books ... which are contained in a Story or Screenplay approved by Marvel ..." (1993 Agreement ¶¶ 6, 11(a).) Fox then contends that both the overall storyline, or premise, of Mutant X and certain specific storylines are sufficiently similar to those

---

**69.** Fox also draws a comparison between the principal villains in the Mutant X series (Mason Eckhart) and the X–Men film (Magneto) in its Amended Complaint and initial moving papers, although defendants' expert does not make such a linkage. (Fox Amend. Compl. ¶ 46(h).) Arguing at a very general level of abstraction, as it does for the other characters, Fox states that both Eckhart and Magneto "had good intentions but have been corrupted and now lead the team of evil mutants and humans aligned against the team of good mutants ..." (Pl. Opp. Dis. at 13.) This contention is unavailing. First, the record does not reflect that Eckhart was "corrupted"; rather, he discovered that the genetic engineering project on which he was working had gone astray and that the way to solve the problem was to cover his tracks by eliminating mutants. Also, unlike Magneto, Eckhart is not a mutant, does not lead a team of mutants, does not have special powers, and does not want to protect mutants. (Chaykin Decl. ¶¶ 18, 36(f).) Second, the similarities that do exist are typical of most villains (e.g.,

evil, mysterious, and relentless) and are generalizable to most stories describing the conflict between good and evil. Fox itself compares Eckhart to the villain in the proposed X–Men sequel, X–2, William Stryker, who also has a mysterious past and previously participated in covert operations. (Rothman Decl. ¶¶ 38–39.) When the characters are examined as individuals, at a more concrete level of abstraction, the similarities disappear.

**70.** The Court has also reviewed the X–Men film and associated trailers submitted by Fox in support of its claims, as well as the director's cut of "Russian Roulette," the first-filmed Mutant X episode. (Ex. F to Fox Amend. Compl; Ex. B. to Wogan Decl. Roulette; X–Men Film.) Such video evidence further supports the Court's conclusion that the characters in each work are substantially different. The Court observes no similarities beyond the general issues discussed *supra,* and clear differences in the personalities of the characters, their costumes, their superpowers, and the depiction of such powers.

encompassed by the X–Men Property to constitute a breach of the 1993 Agreement.

Fox contends that in both works, a super-intelligent and wealthy good mutant seeks out young mutants, trains them to use their powers, and protects them from a potentially hostile world, consisting of bad mutants and humans who seek to control them. (Fox Opp. Dis. at 14.) In addition to misrepresenting certain aspects of the Mutant X premise (Adam is not a mutant and there is no team of bad mutants), the generalized plot scenario represented by this premise is common to fiction in general and science fictional works in particular. One example is the nurturing of the gifted Luke Skywalker by Obi-Wan ("Ben") Kenobi in *Star Wars*, of which the Court takes judicial notice.[71] Moreover, the fact that the Mutant X characters, like the X–Men, may "struggle with their status as mutants" and "fight[ ] against societal prejudice and government persecution" does not indicate a breach of contract, because such struggles are also typical of superheroes. (Witek Decl. ¶ 40; Marschall Decl. ¶ 15 (noting that "relationships and conflicts between [ ] superhuman characters and ordinary members of society," and the former's alienation from society as a result of their powers, are common themes in Marvel comics).) Further, "complicated personal relations" are typical of any drama. (Witek Decl. ¶ 40.)

Beyond the above generalities, the premise of Mutant X is admittedly novel. The Mutant X characters are at the center of society's current moral debate concerning the mapping of the human genome and genetic engineering, and their powers are due to genetic experimentation. In contrast, the powers of the X–Men are naturally occurring, and, as noted *supra*, the central allegory of the series is to historically oppressed or disenfranchised groups.[72] Further, Mutant X involves neither a full-scale conflict between humans and thousands of mutants, nor between good and evil mutants; rather, it features a much smaller number of mutants (i.e. few hundred) who are unknown to the public and are attempting to evade Eckhart and certain "guest villains" working for him. (Chaykin Decl. ¶ 15.) The premise of mutant individuals seeking to evade the government entity that created them is parallel to the plot of Fox's Dark Angel television series. (Chernin Dep. at 21:11–22:16, 26:18–25.) Moreover, while the U.S. government is a primary antagonist in the X–Men, Eckhart's Genomex, a privately held company affiliated with the government's secret Genetic Security Agency, is "rarely the central antagonist, as each episode contains its own guest villains." (Chaykin Dep. ¶ 15, Ex. D; Witek Decl. ¶ 39 & n. 4.) Further, unlike the X–Men's Professor Xavier, Adam does not train the Mutant X team to be a fighting force, but simply to lead normal lives, and seeks to assist other mutants in doing the same. (Arad Decl. ¶ 38.)

With regard to specific storylines,[73] Fox contends that elements of certain X–Men

---

71. *Star Wars* is one of the most well-known and widely viewed science fiction films. Under the Federal Rules of Evidence, the Court may take judicial notice of any fact which is a matter of common and general knowledge in its jurisdiction. Fed.R.Evid. 201(b).

72. The fact that the issue of genetic engineering was explored in a small number of X–Men comics is irrelevant. (Witek Decl. ¶ 43). Moreover, contrary to the suggestion of Fox's expert, the record does not reflect that Wolverine was subject to genetic engineering, or that his powers resulted from such. (*Id.* ¶ 43, Ex. 30.)

73. It should be noted that, as written, the Agreement provides Fox with the right to storylines of the X–Men Property "which are contained in a Story or Screenplay approved by Marvel." (1993 Agreement ¶ 6.) Although this provision suggests, on its face, that Mar-

storylines appear in three planned Mutant X episodes. Specifically, Fox states that (i) the concept of a prototype gun designed to neutralize the powers of its targets, first exploited in a story in the Uncanny X–Men comic book series, is the centerpiece of the Mutant X "Russian Roulette" episode;[74] (ii) the story of the "Legacy Virus," which kills mutants by causing their powers to go out of control until they are consumed from within, first exploited in several X–Men comics between 1993 and early 2001, is paralleled in a Mutant X episode entitled "The Meaning of Death"; and (iii) the occasional portrayal of mutants in concentration camps in the X–Men series is paralleled in a Mutant X episode entitled "I Scream the Body Electric." (Witek Decl. ¶¶ 61–67; Tr. at 11:12–12:8.) However, the purportedly similar elements, i.e., weapons that neutralize power, powerful viruses, and imprisonment in internment camps, are general themes running through literature and do not demonstrate an exploitation of the X–Men Property by defendants.

### iii. Other Elements Related to Storylines

Fox finally contends that defendants have appropriated certain distinctive X–Men elements, namely a "VTOL" (vertical take-off and landing) jet aircraft for transport of the team and a hideout or sanctuary, denominated in the X–Men. as the "danger room" and in Mutant X as the "Sanctuary." (Witek Decl. ¶¶ 68–70.) However, as defendants point out, VTOL jets have been used by other Marvel superheroes, including the Fantastic Four

(VTOL Fantasticar) and the Avengers (VTOL Quinn Jets). (Marschall Decl. ¶¶ 12, 28.) Moreover, defendants have recognized the potential for confusion potentially posed by use of a jet of similar size, shape or color, and, accordingly, are in the process of designing a jet that is distinct from the X–Men's "Blackbird" with respect to such elements. (Chaykin Decl. ¶ 45, Ex. F (stating that the VTOL will probably be green, rather than black, and is "boxier" than the Blackbird because it was modeled after a NASA Space Shuttle design)); Witek Decl. ¶ 69, Ex. 47; see also E-mail from Rick Ungar to Philip Segal dated Feb. 21, 2001, Ex. 49 to Witek Decl. (stating that "[t]he sleek, BLACK, VTOL is remarkably similar to the X–Men's Blackbird. Bad idea. Can we do something to separate Adam's vehicle from the Blackbird?")

Sanctuaries are also commonly used by teams of superheroes, and specifically by both Marvel's Fantastic Four and the Avengers. (Marschall Decl. ¶¶ 11, 28.) Moreover, on the basis of the pictorial and video evidence that the parties have submitted, the designs of the sanctuaries in Mutant X and the X–Men are considerably different, the former containing a mix of Asian and Spanish styles conveying a feeling of warmth and the latter metallic, futuristic, and cold. (Chaykin Decl. ¶ 38, Ex. E; Ex. 50 to Witek Decl.; Ex. B to Wogan Decl. Roulette; X–Men Film.) Further, while both sanctuaries apparently contain training rooms with the capability of three-dimensional holographic projection, the "Virtual Dojo" of Mutant X is designed for meditation, while X–Men's danger room is

---

vel controls the scope of the license as to storylines, the approval provision does not suggest that Marvel may veto Fox's choice of storylines. Rather, Marvel's approval role appears designed to ensure the integrity of the Property as portrayed in a theatrical motion picture. (*Id.* ¶ 11.)

**74.** Fox also contends that a similar story is contained in an initial treatment for the X–Men sequel, X–2. (Rothman Decl. ¶ 38.)

designed to prepare team members for battle.[75] (Chaykin Decl. ¶¶ 39–40; Witek Decl. ¶ 70, Ex. 50.)

In sum, the Court finds that Fox is not likely to succeed on its breach of contract claim to the extent it alleges misappropriation of X–Men storylines and related elements.

## 2. Irreparable Harm

■ In its moving papers, Fox asserts that it would suffer incalculable irreparable harm if the Court declined to enjoin the broadcast of Mutant X, because the series will dilute the value of the "X–Men film franchise." (Pl. Mem. at 20 ("Fox will suffer irreparable harm if Defendants are not barred from proceeding with their proposed 'Mutant X' series"); Pl. Rep. at 32–38.) The focus of Fox's concerns are X–Men sequels. However, neither the nature nor quality of the alleged harm is precisely explained. Each side presents equally plausible, yet equally indeterminate, views concerning the impact of a television series, in particular a live-action series, on the value of a theatrical motion picture based on the same underlying property which is produced after the television series is released. (*Compare* Kamon Decl. ¶¶ 21–26 (noting that there is a "potential for harm" if the television production is of poor or lesser quality than the film, which potential is "more severe when the program at issue is a series, rather than a one-time show or even a mini-series with a limited number of episodes") and Rothman Decl. ¶¶ 34–35 (stating that audiences would be less inclined to pay to see a theatrical motion picture when they can see a similar program for free every week on television, and that Mutant X will tarnish the X–Men Property because it has a lower budget), *with* Leavitt Decl. ¶¶ 28–30 (stating that genres other than made-for-television movies do not compete with, and would not threaten the market for, a feature film), and Declaration of Shelly Schwab dated June 17, 2001 ("Schwab Decl.") ¶¶ 1, 5–6, 8–10, 15 (noting that television and film audiences have different expectations as to the quality of the respective productions, and opining that it is probable that a Mutant X television series based on the X–Men Property would increase, not decrease, the value of Fox's theatrical motion pictures by widening the X–Men viewing audience); *see also* Deposition of Joseph Calamari at 91:23–94:7 (stating that live-action television would not interfere with the market for theatrical motion pictures).) [76] Each side presents differing opinions concerning the relative success of specific television series and theatrical motion pictures which have been produced based on the same property; and neither side has pointed to an example precisely analogous to this case, that is, the production of a theatrical motion picture sequel following the release of a live-

75. Defendants assert that holographic projection chambers have been used, and popularized, in other productions, in particular the television series "Star Trek: The Next Generation" and in the motion picture "The Matrix," on which the principal script writer of Mutant X purportedly relied in creating the Virtual Dojo. (Chaykin Decl. ¶ 39.)

76. Defendants also point out that in 1996, Fox broadcast "Generation X," a made-for-television movie, while it was simultaneously developing the X–Men film, and that the X–Men animated television series which ran during the 1990s buttressed the fan base for the movie (Wogan Decl. ¶¶ 16–19, 21–22, Exs. A, B, E, F; Schwab Decl. ¶¶ 7, 9–10, 12–14.) Fox asserts that "Generation X" ran only once, as opposed to every week like a series, that animated series do not have as negative an impact on feature films as a live-action series, and that Fox benefited financially from each of the referenced productions. (Rothman Decl. ¶¶ 47–49; Chernin Dep. at 39:12–25.)

action television series. (Schwab Decl. ¶ 8, Exs. C, D; Declaration of Marvin Antonowsky dated June 24, 2001 ("Antonowsky Decl.") ¶¶ 18–29.) Moreover, such views are based on the assumption that the series in question is substantially similar to the film in substance, which is not the case here.

Even assuming Fox were correct that a television series posed a competitive threat to a movie sequel derived from the same Property, the record does not suggest that any harm to Fox is actual or imminent. While the Mutant X series, like all television series, has a more limited budget than a feature film, and requires fewer days to shoot, (see, e.g., Rothman Decl. ¶ 35; Askin Decl. ¶ 13), nothing in the record indicates that the new series will be of low quality.[77] While Fox's assertions of irreparable harm relate to the future "X–Men franchise" (Cohen Decl. ¶ 35), the proposed X–Men sequel, referred to as X–2, is currently at the earliest stages of development.[78] (Wogan Decl. ¶ 5.) Moreover, given the fact that Fox owns goodwill in neither the X–Men films in general nor the Mutant X name in particular, see supra, the possibility of unquantifiable losses of goodwill or reputation from the production of a lower quality series is irrelevant here. Rather, the record reflects that the sole measure of damages to Fox from defendants' use of the Mutant X name would be loss of profits, which, although difficult to precisely quantify, (Antonowsky Decl. ¶ 32 (stating that quantifying the harm to X–Men from Mutant X would require a determination of "imponderable elements" such as the impact on revenues of sequels)), may be estimated in monetary terms, according to the President of Fox's parent and Fox's Senior Vice President for Participations. (Cf. Chernin Dep. at 83:2–84:6 (stating that the Mutant X series would harm Fox's ability to market an X–Men sequel and "we would quantify that harm by dollars")); Kaplan Decl. ¶ 10 (stating that he could estimate the effect of the Mutant X series on the box office for an X–Men sequel, although he could not evaluate the "appropriateness or validity of such a calculation"). Accordingly, because the Court cannot conclude that a "Mutant X" series will irreparably harm Fox's interest in the X–Men films, it denies Fox's motion for preliminary injunction with respect to its breach of contract claim. Cf. Moteles v. Univ. of Pennsylvania, 730 F.2d 913, 918 (3d Cir.1984) (declining to accept "the rationale that any clear violation of one's civil rights constitutes irreparable harm.")

This ruling does not eliminate the possibility of permanent injunctive relief follow-

---

77. The record reflects that the limitations of budget and timetable merely dictate a shift in the focus in a television series to character development, rather than plot. Such character focus is important, in turn, "because a television audience, in contrast to a motion picture audience, must be drawn back week after week and the way to draw that audience back is to keep them interested in the 'lives' of the series' characters." (Askin Decl. ¶ 13.)

Further, because Marvel is the source of the goodwill in the X–Men and has a significant financial interest in existing and future X–Men films, it seems unlikely that it would create a series that undermines such interests. (See Marvel Compl. ¶ 32 (stating that it is contrary to Marvel's interests to harm its rela-

tionship with Fox or oversaturate the market with X–Men–related productions)).

78. The parties disagree as to when a sequel will be produced, or if it will be produced. Schwab Decl. ¶ 11 (stating that the sequel may not be produced, and doubting whether it would be released by 2002; Rothman Decl. ¶ 25 (stating that Fox is "hard at work" on "X–2" and intends to release it for the Christmas 2002 season)). However, it is undisputed that the production has not begun, and there are several gaps to fill before it does begin, such as a final script, budget, and approval for active production by Fox management. (Rothman Decl. ¶ 26; Schwab Decl. ¶ 11).

ing a trial on the merits, particularly in light of Fox's allegations concerning defendants' use of the Mutant X name as the title of their series. Fox's proposed order for injunctive relief requests that the Court enjoin the production of any live-action television motion picture that "bears the title 'Mutant X', or any other similar title which causes confusion with the 'X–Men', including but not limited to titles using the term 'Mutant' or the letter 'X'." (Proposed Order Granting Injunctive Relief.) For the reasons stated in the previous section, the Court is of the opinion that neither the term "Mutant," nor the term "X," standing alone as incorporated in the series title, would warrant a finding of breach of contract. Consequently, an alternative name need only eliminate either "Mutant" or "X," not both, provided that neither the new name, nor any of its components, is itself part of the X–Men Property.[79]

## B. Copyright Claim

Fox's copyright claim consists of two elements: (i) defendants' alleged use, in Mutant X sales presentation videotapes, of clips from Fox's copyrighted X–Men film and trailers; and (ii) defendants' alleged promotional use of a Mutant X logo that is substantially similar to Fox's copyrighted X–Men logos. The Court applies the traditional standard for preliminary relief to this claim. Defendants state that they have replaced the allegedly infringing videos and logo with new non-infringing promotional materials; thus, the requested injunction would be designed to preserve the status quo. *Tom Doherty*, 60 F.3d at 34. Even if defendants have not removed such materials, a limited injunction ordering such removal and preventing further

use of the material would not deprive them of a meaningful remedy should they prevail at a trial on the merits. *Id.* at 35.

## 1. Likelihood of Success

To demonstrate likelihood of success on a copyright claim, a plaintiff must establish prima facie infringement by showing that it owns a valid copyright and that the defendant has engaged in unauthorized copying. *See ABKCO Music v. Stellar Records*, 96 F.3d 60, 64 (2d Cir. 1996) (citing *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985)). Fox has established a substantial likelihood of success on its claim with respect to defendants' use of the video clips, because defendants' have conceded such use. The Court finds unavailing defendants' argument that Fox is not likely to succeed based on the "fair use" doctrine, on the ground that defendants' use is *de minimis* and/or an accepted practice in the entertainment industry. (Def. Mem. at 31.)

First, the *de minimis* concept, which is considered separately from, and in advance of, the fair use analysis, focuses on whether "copying has occurred to such a trivial extent as to fall below the quantitative threshold of substantial similarity, which is always required as an element of actionable copying." *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 74 (2d Cir.1997). In cases like the instant one involving visual works, the substantial similarity analyses centers on the observability of the copied work, which includes the length of time the copied work is observable in the allegedly infringing work and such factors as focus, lighting,

---

**79.** In this regard, the Court notes that the use of the term "New Mutants" as the name of the series, which apparently was employed in the prospective title of the series early on in its development, would implicate the X–Men Property, specifically the comic book series of that name which ran from 1983 to 1991.

camera angles, and prominence. *Id.* at 75. Here, defendants have incorporated substantial portions of Fox's X–Men trailers, and certain highlights of the film, directly into their advertising tapes. Although the clips are each of a short duration, of three seconds or less, they appear prominently and are plainly observable to the lay viewer. *See Rogers v. Koons,* 960 F.2d 301, 307 (2d Cir.1992). Such a display of copyrighted material is not *de minimis.*[80] *See Ringgold,* 126 F.3d at 77 (suggesting that full-screen "background displays" of three seconds or less is not *de minimis* ).

■ Second, defendants' fair use defense is inapplicable here. In determining whether an alleged infringement constitutes a fair use, courts consider: (i) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (ii) the nature of the copyrighted work; (iii) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (iv) the effect of the use upon the potential market for or value of the copyrighted work. Here, defendants' use, like Fox's use, is commercial and is not transformative of either the X–Men film or its trailers. *See*

*Columbia Pictures Indus., Inc. v. Miramax Films Corp.,* 11 F.Supp.2d 1179, 1188 (C.D.Cal.1998) ("Defendants' ads seek to use Plaintiffs' ads as a vehicle to entice viewers to see [Defendants' film] in the same manner as Plaintiffs used their own ads to entice viewers to see [Plaintiff's film]. In such circumstances, Defendants have not created a transformative work which alters the original with new expression, meaning or message."); *see also Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 586, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (noting that the central purpose of the first factor is to see "whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message"). The X–Men film and its associated trailers are clearly works deserving of copyright protection because they are highly creative, expressive works, from which defendants have directly copied. *See Campbell,* 510 U.S. at 586, 114 S.Ct. 1164 (noting that the second factor "calls for the recognition that some works are closer to the core of intended copyright protection than others," and the more that the infringing ma-

---

**80.** Specifically, two of the principal scenes depicted in Fox's trailers—Wolverine's comment, "A war is coming. Are you on the right side?", and a graphic of Shadowcat walking through a door at Professor Xavier's Academy—are featured prominently in defendants' sales videotapes. (Exs. A, B to Fox Amend. Compl.) Wolverine's comment is the only film dialogue used from any of the clips in the sales tapes. Further, from the Court's observation, there are approximately ten other clips from the X–Men film that are featured in the brief advertisement. (*Id.;* Harper Decl. ¶ 13.) Some of the narration is also parallel to that which appears in an X–Men trailer. (Harper Decl. ¶ 15.) *Sandoval v. New Line Cinema Corp.,* 147 F.3d 215, 217–18 (2d Cir. 1998), on which defendants rely, is inapposite. (Def. Mem. at 31.) There, the alleged

use of copyrighted photographs for approximately 30 seconds in the background of a much longer film, such that the average lay observer could not identify the subject matter of the photographs, was held *de minimis* and not actionable. Here, in contrast, the clips appear prominently in the sales videos and constitute a large percentage of each allegedly infringing segment.

The Court also notes that the use of such clips is contrary to defendants' position, reflected by the current record, that the Mutant X series bears only an incidental relationship to the X–Men Property. (*Cf.* Urick Decl. ¶ 8 (stating that the President of Marvel Characters Group suggested that X–Men film footage be removed from the Mutant X sales video because it detracted from the fact that it was to be a new, original show).)

terial resembles the original, the more it will fall within such core of protection). Further, although the appropriated segments are each individually brief, collectively their presence is significant; in particular, Fox points out that on the shorter of the Mutant X sales tapes, the X–Men material comprises more than a quarter of the tape. (Pl. Rep. at 7.) The clips are plainly observable and depict substantial, and among the most memorable, highlights of the trailers and the film, which collectively go to the "heart" of Fox's copyrighted works.[81] *See Harper & Row Pubs. v. Nation Enters.*, 471 U.S. 539, 564–65, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Finally, while there is a question as to whether defendants' use of the clips would harm the existing market for Fox's X–Men film or trailers, Fox has established that the market for excerpts of such works has been, and will continue to be, negatively affected by defendants' use of the infringing clips without a license. (Declaration of Elizabeth Masterson dated June 25, 2001 ("Masterson Decl.") ¶¶ 3–6); *see Ringgold*, 126 F.3d at 81 (noting that the fourth factor will favor a plaintiff who can show a "traditional, reasonable, or likely to be developed market for licensing [the] work").

Accordingly, the Court finds that each of the four factors weighs against a finding of fair use, and against a dismissal of Fox's copyright claim as to the video clips.[82]

The mere fact that use of footage from pre-existing films or television shows is commonplace to convey the general concept of a syndicated television series—for which pilots are not yet available—does not minimize the potential harm resulting from infringement, and therefore does not support the defense of fair use here. (Def. Mem. at 31; Urick Decl. ¶¶ 4–5; Expert Declaration of Douglas Friedman dated June 17, 2001 ¶¶ 9–12; Askin Decl. ¶ 22; Declaration of Steven H. Rosenfeld dated June 17, 2001 ¶¶ 4, 6–9.) If use of such footage is indeed commonplace, it would also seem that obtaining a license to use such footage would, or should, likewise be an industry convention. (*See* Antonowsky Decl. ¶ 14 (stating that the industry practice is to obtain permission before using the copyrighted work of another).) Fox asserts that such is the general practice with respect to Fox's property, and that Marvel itself has recently licensed certain clips of the X–Men film from Fox for use

---

**81.** Even were this factor to tip toward defendants, a finding of fair use would not be warranted, given that the other three factors decisively favor Fox. As the Second Circuit has stated with regard to the third factor:

Courts considering the fair use defense in the context of visual works copied or displayed in other visual works must be careful not to permit this factor too easily to tip the aggregate fair use assessment in favor of those whom the other three factors do not favor. Otherwise, a defendant who uses a creative work in a way that does not serve any of the purposes for which the fair use defense is normally invoked and that impairs the market for licensing the work will escape liability simply by claiming only a small infringement.

*Ringgold*, 126 F.3d at 80.

**82.** Defendants rely on *Hofheinz v. AMC Prods., Inc.*, 147 F.Supp.2d 127 (E.D.N.Y. 2001), where the defendants allegedly used a series of copyrighted clips and still photographs in a documentary. The court determined that the documentary, although commercial, was transformative, that the allegedly infringing material was a mix of creative and less creative expression, that "no more [of the infringing material was] taken than was necessary for defendants to produce the Documentary," and that the market for the plaintiff's copyrighted works would not be harmed, in major part because the film clips were found to be too few and too short to undercut such market. *Id.* at 137–41. In this case, as noted *supra*, the opposite conclusion applies as to each factor.

at a video game trade show. (Masterson Decl. ¶ 7, Ex. B.)

Although Fox has established that it owns valid copyrights in the X–Men logos, the Court cannot conclude that Fox is likely to succeed on the merits of its claim with respect to the logos, given the outstanding questions with regard to Fox's creation of the works (i.e. whether it is derivative) and observable dissimilarities between the two logos in question. Nevertheless, for the reasons the Court discussed in denying defendants' motion to dismiss Fox's copyright claim, there are sufficiently serious questions as to the infringement of Fox's copyrights in the logos to constitute a fair ground for litigation.[83] See Part II.F, *supra*. Moreover, given the potential harm the allegedly infringing logo could cause to Fox's rights, and the fact that defendants represent that they are in the process of discontinuing use of such logo, the balance of equities clearly favors Fox on this aspect of its copyright claim.

### 2. Irreparable Harm

■ Because Fox has demonstrated prima facie infringement as to the video clips, a presumption of irreparable harm arises as to this aspect of its copyright claim. See *ABKCO Music*, 96 F.3d at 64. Defendants attempt to rebut such presumption by asserting that they have (i) voluntarily removed all X–Men clips from their sales presentation materials, and do not intend to reuse such clips, and (ii) affirmatively requested that the television

stations return all "pitch kits" that contain the allegedly infringing clips.[84] (Def. Mem. at 30 & n. 20; Ex. 3 to Def. Rep. Dis.; Urick Decl. ¶¶ 11–13.) Similarly, defendants assert that Fox cannot establish irreparable harm with regard to the X–Men logos, because defendants have changed the design of the Mutant X logo to avoid any substantial similarity with Fox's logos.[85] (Def. Rep. Dis., Ex. 3.)

Although defendants claim that the allegedly infringing clips have been recalled, they have not submitted any proof that all clips have been eliminated from the market. Nor is their expressed intention not to use such clips sufficient to eliminate the possibility of irreparable harm, given the nature of the copying in this case. Even if the tapes have been totally recalled, an award of preliminary relief is not moot; defendants have not provided the Court with a consent injunction or other enforceable assurance that their alleged infringement will not be repeated. See *Columbia Pictures Indus.*, 11 F.Supp.2d at 1183 (stating that where defendants' posters and film trailers allegedly infringed plaintiffs' copyrights, "[t]he withdrawal of the complained of advertising does not render this action moot" on motion for preliminary injunction); *Upjohn Co. v. Am. Home Prods. Corp.*, 598 F.Supp. 550, 554–55 (S.D.N.Y.1984) ("Before a suit for injunctive relief can be dismissed as moot, the offending conduct must have ceased and the court must find that there is no reasonable expectation that it will resume.") (citations omitted); *see also United States*

---

**83.** Fox also points out that one of the producers of the Mutant X series acknowledged at his deposition that there are similarities between the existing Mutant X logo and Fox's X–Men logo. (Deposition of Jamie Paul Rock ("Rock Dep.") at 63:25–64:18.)

**84.** Defendants have also purportedly edited their sales presentation slides to exclude the

phrase "Based on the Box Office Smash X–Men" and have issued a disclaimer advising television stations that Fox is not associated with Mutant X. (Askin Decl. ¶¶ 24–26.)

**85.** Tribune's Vice President of Marketing also states that the Mutant X logo originally designed was "temporary." (Urick Decl. ¶ 14.)

*v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (stating that "the court's power to grant injunctive relief survives discontinuance of the illegal conduct," and noting that the burden of showing that "there is no reasonable expectation that the wrong will be repeated ... is a heavy one"). Moreover, as of the date of this Opinion, the original Mutant X logo is still featured prominently on the Internet website used to promote the new series.[86] (*See also* Rock Dep. at 66:11–19 (affirming that there has been no official decision as to whether to change the original Mutant X logo)). Accordingly, the Court finds that an injunction, albeit a limited one, is warranted. It therefore grants Fox's motion for preliminary injunction to the extent that defendants are prohibited from using (a) video clips from the X–Men film and/or trailers in order to promote defendants' new series, and (b) a logo that is substantially similar to that used by Fox in connection with the X–Men film, including the three-dimensional green metallic logo currently used to promote Mutant X.

### C. Other Claims

The Court has granted defendants' motion to dismiss Fox's claims for breach of the implied covenant of good faith and fair dealing, tortious interference, violation of the Lanham Act, common law unfair competition, and Section 349. Accordingly, as to these claims, Fox's motion for preliminary injunction is denied as moot.

### IV. Conclusion

For the foregoing reasons, the Court (i) grants defendants' motion to dismiss as to each of Fox's claims except its breach of contract and copyright claims, and (ii)

---

86. *See www.mutantxtv.com.* Marvel references this website in its Complaint as the official site for the new series, at which "Marvel's

grants Fox's motion for preliminary injunction, but only as to defendants' use of (a) video clips from the X–Men film and/or trailers in order to promote defendants' new series, and (b) a logo that is substantially similar to that used by Fox in connection with the X–Men film, including the green metallic logo currently used to promote Mutant X.

SO ORDERED.

consumers are able to learn about the Series as it is developing ...." (Marvel Compl. ¶ 22.)